# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **LaShawn Robinson**, on behalf of herself and her five children; **Nichole Burke-Kane**, on behalf of herself and her minor son; **Natalie Delgado**, on behalf of herself and her two minor children; **Shara Ferguson**, on behalf of herself and her four minor children; **Marie Joulet**, on behalf of herself and her three minor children; **Tynima Toney**, on behalf of herself and her two minor children; and **Juan Tirado** and **Jahaira Velazquez**, on behalf of themselves and their two minor children, | Civil Action No. _____ |
|         Plaintiffs, | |
|      v. | FEBRUARY 15, 2018 |
| **Dianna Wentzell**, in her official capacity as Commissioner, Connecticut State Department of Education; **Glen Peterson**, in his official capacity as the Director, Sheff and Regional School Choice Office; **Allan B. Taylor**, in his official capacity as Chairperson of the Connecticut State Department of Education's Board of Education; **Dannel Malloy**, in his official capacity as Governor of Connecticut; **George Jepsen**, in his official capacity as Connecticut Attorney General; and **Craig Stallings**, in his official capacity Chairperson of the Hartford Public Schools Board of Education, | **Jury Trial Demanded** |
|         Defendants. | |

# COMPLAINT

## INTRODUCTION

1.      Thousands of Hartford's most needy students suffer under an education bureaucracy that is more concerned with the color of a child's skin than her academic future. Every year, hundreds of Hartford's black and Hispanic students are denied admission to the City's best schools solely because of their race. Hartford's world-class magnet schools have the space to educate these students, but they are kept out by a racial quota that reserves 25% of the seats at the best schools for students who are white. These schools are literally mandated to leave desks unoccupied if enrolling an additional black or Hispanic child would upset the racial quota. Turned away from Hartford's best schools, these black and Hispanic students are forced into Hartford's failing neighborhood schools, where their hope for a bright future is, all-too-often, extinguished.

2.      In addition to the racial quota, Hartford students are routinely sorted and classified by race in a backroom "lottery" that determines whether a student's dream of a quality school will be fulfilled. A recent exposé by the *Hartford Courant* detailed this divvying up by race: "The state-run school choice lottery . . . is in fact a carefully engineered process designed to push white and Asian students toward the front of the line at magnet schools that still attract too few non-minority applicants."[1]

---

[1] Matthew Kauffman and Vanessa de la Torre, *Beyond Reach: Even As Magnet School Seats Remain Empty, Racial Quotas Keep Many Black, Latino Students Out*, Hartford Courant (Mar. 13, 2017), http://www.courant.com/education/hc-sheff-lottery-empty-seats-day-2-20170313-story.html.

3.     Today, seven brave families challenge this rampant unconstitutional discrimination by Connecticut and Hartford officials. Included among the plaintiffs bringing this lawsuit is a mother who was a student in the Hartford school system twenty years ago when a prior lawsuit promised a brighter future for her children. She has had to watch as her once-curious son lost out on lottery after lottery, and was sent to a school where bullying, chaos, and confusion have all but sapped his will to learn. Another mother came to Hartford from Puerto Rico specifically to give her daughters a better education. Having "lost" in the lottery multiple times, she too fears for her daughters' future at their current school, where reading and math scores are among the worst in Connecticut. Another mother describes the plight of her son, who has been ranked between 8th and 15th on three different magnet school waiting lists, but who has never received the dream phone call that would give him the opportunity for a future he deserves. These and other families challenge the racial discrimination by Connecticut and Hartford officials that is denying their children the opportunity to compete for available seats in Hartford's world-class magnet schools.

## JURISDICTION AND VENUE

4.     This action arises under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. §§ 1981 & 1983. The Court has jurisdiction over these federal claims under 28 U.S.C. §§ 1331 (federal question) and 1343(a) (redress for deprivation of civil rights). Declaratory relief is authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), as Defendants are residents of this judicial district and the State of Connecticut. Venue is also proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claim occurred or will occur in this judicial district.

PARTIES

**_Plaintiffs_**

6.     LASHAWN ROBINSON lives in Hartford with her five children. She and her children are African-American. Ms. Robinson's children all attend Hartford Public Schools. All have applied to attend Hartford magnet schools and will continue to do so as long as they are eligible. Jr.T. is a 19-year-old African-American boy in the 11th grade. J.T. is a 15-year-old African-American boy in the 9th Grade. N.H. is an 11-year-old African-American boy in 5th grade. J.H. is a 10-year-old African-American girl in 4th grade. T.R. is a five-year-old African-American girl in kindergarten. As the mother and legal guardian of her five children, Ms. Robinson claims their injuries in this litigation. _See Parents Involved in Community Schools v. Seattle Sch. Dist. No. 1_, 551 U.S. 701, 718-19 (2007).

7.     NICHOLE BURKE-KANE and her son C.K. are African-American. C.K. is six-years old and attends a Hartford public school. Ms. Burke-Kane has twice applied for C.K. to attend a Hartford magnet school, but he has never been accepted. She will apply for C.K. to attend a magnet school next year, and all subsequent years he is eligible. As the mother and legal guardian of C.K, Ms. Burke-Kane claims his injury in this litigation. _See id._

4

8.     NATALIE DELGADO, originally from Puerto Rico, came to Hartford for better opportunities for her daughters, I.M. and D.M. I.M. is 10-years old and is currently in 5th grade. D.M. is nine-years old and is currently in 4th grade. Both children attend a Hartford public school. Ms. Delgado has applied for her children to attend magnet schools in the City of Hartford, and she will continue to do so as long as they are eligible. As the mother and legal guardian of her children, Ms. Delgado claims their injuries in this litigation. *See id.*

9.     SHARA FERGUSON and her children are African-American. Her son C.K. is 15-years old and is currently in 9th grade. Her son J.H. is nine-years old and is currently in the 4th grade. Her daughter C.B. is seven-years old and is currently in the 2nd grade. Her son J.B. is five-years old and is currently in kindergarten. C.K., J.H., C.B., and J.B. all attend Hartford Public Schools. Ms. Ferguson has applied for C.K., J.H., C.B., and J.B. to attend Hartford magnet schools multiple times, and she will continue to do so long as they are eligible. Her children have never been selected to attend a magnet school. As the mother and legal guardian of her children, Ms. Ferguson claims their injuries in this litigation. *See id.*

10.     MARIE JOULET and her minor children are Hispanic. Her three children all attend Hartford Public Schools. Her son Kz.R. is 16-years old and is currently in the 9th grade. Ms. Joulet's son Kl.R. is 14-years old and is currently in the 7th grade. Ms. Joulet's son A.C. is 10-years old and is currently in the 5th grade. Ms. Joulet has applied for her children to attend Hartford magnet schools multiple times, and she

will continue to do so, as long as they are eligible. As the mother and legal guardian of her children, Ms. Joulet claims their injuries in this litigation. *See id.*

11.     TYNIMA TONEY and her two minor children are African-American. Her children attend Hartford Public Schools. Ms. Toney's son Za.C. is eight-years old, and her daughter Zy.C. is seven-years old. Ms. Toney has applied to Hartford magnet schools for both of her children every year they have been eligible, and she will continue to do so in the future. Her children have never been accepted at to attend a magnet school. As the mother and legal guardian of her children, Ms. Toney claims their injuries in this litigation. *See id.*

12.     JAHAIRA VELAZQUEZ is originally from Puerto Rico and has two minor children that attend Hartford Public Schools. Both she and her children are Hispanic. Y.T. is nine-years old and is currently in 4th grade. J.T. is seven-years old and is currently in 2nd grade. She has applied for her children to attend magnet schools in Hartford, and she will continue to do so as long as they are eligible. As the mother and legal guardian of her children, Ms. Velazquez claims their injuries in this litigation. *See id.*

13.     JUAN TIRADO, originally from Puerto Rico, is married to Plaintiff Jahaira Velazquez, and he is Y.T. and J.T.'s father. With Ms. Velazquez, Mr. Tirado has applied for his children to attend magnet schools in Hartford, and they will continue to do so as long as they are eligible. As the father and legal guardian of his children, Mr. Tirado claims their injuries in this litigation. *See id.*

14.     All Plaintiffs have in the past applied for their children to attend Hartford magnet schools, and all will continue to apply for a chance to enroll their children in one of the Hartford magnet schools.

## *Defendants*

### *Connecticut State Department of Education*

15.     DIANNA WENTZELL is the Commissioner[2] of the Connecticut State Department of Education (Department of Education or Department). Dr. Wentzell is sued in her official capacity.

16.     The Department of Education serves "as the administrative arm of the State Board of Education." Conn. Gen. Stat. § 10-3(a). The Department is "under the direction" of the Commissioner of Education, who "shall be the administrative officer of the department and shall administer, coordinate and supervise the activities of the department in accordance with the policies established by the board." *Id*. The appointment of the Commissioner is recommended by the Board of Education to the Governor, for a term of four years to be coterminous with the term of the Governor. *Id*.

17.     The Board of Education is obligated to "organize the Department of Education into such bureaus, divisions and other units as may be necessary for the efficient conduct of the business of the department." *Id*. § 10-3(b). The Board has

---

[2] Pursuant to Connecticut General Statute § 10.2(b), whenever "the term the secretary to the State Board of Education occurs or is referred to in the general statutes, it shall be deemed to mean or refer to the Commissioner of Education."

"general supervision and control of the educational interests of the state," including elementary education. *Id*. § 10-4(a).

19.     The Department of Education is tasked with, among other things, "assisting the state in meeting the goals" in the *Sheff v. O'Neill*, 238 Conn. 1 (1996) settlements and stipulations. Conn. Gen. Stat. § 10-264*l*(a). The Commissioner of Education is responsible for, among other things, developing the "reduced-isolation setting standards for interdistrict magnet school programs" that are the subject of this litigation. *Id*.

### *Regional School Choice Office (RSCO)*

20.     The Connecticut Department of Education created the Regional School Choice Office in response to the *Sheff* decision. The RSCO conducts, operates, and administers the lottery process for interdistrict magnet schools that is the subject of this lawsuit.

21.     GLEN PETERSON is the Director of Connecticut's Sheff and Regional School Choice Office, and is sued in his official capacity.

### *Connecticut State Board of Education*

22.     The Connecticut State Board of Education (State Board) has "general supervision and control of the educational interests of the state," including elementary education. Conn. Gen. Stat. § 10-4(a). Among other things, the State Board "shall ensure that all interdistrict educational programs and activities receiving state funding are conducted in a manner that promotes a diverse learning environment[,]" and it "may establish reasonable enrollment priorities to encourage

such programs and activities to have racially, ethnically and economically diverse student populations." Conn. Gen. Stat. § 10-276b.

23.   ALLAN B. TAYLOR is Chairperson of Connecticut's State Board of Education and is sued in his official capacity.

### State Officials

24.   DANNEL MALLOY is the Governor of Connecticut and is sued in his official capacity. As Governor, he is vested with the "supreme executive power of the state." Conn. Gen. Stat. § 3-1. Among other things, the governor is responsible for appointing, with the advice and consent of the Connecticut General Assembly, the members of the State Board of Education, and the governor selects one Board member as chair. Id. §§ 10-1(b), 10-2(a). The Governor appoints the Commissioner of Education, upon recommendation by the Board of Education, for a term of four years to be coterminous with the term of the Governor. Id. § 10-3(a).

25.   GEORGE JEPSEN currently serves as Attorney General for the State of Connecticut and is sued in his official capacity. The Attorney General has "general supervision over all legal matters in which the state is an interested party." Conn. Gen. Stat. § 3-125.

### Hartford Public Schools Board of Education

26.   The Hartford Board, like all local and regional boards of education, has "charge of the schools of its [] school district[.]" Conn. Gen. Stat. § 10-220(a). Among other things, the Hartford Board must "determine the number, age and qualifications

of the pupils to be admitted into each school[]" and "designate the schools which shall be attended by the various children within the school district[.]" *Id.*

27.    CRAIG STALLINGS is Chairman of the Hartford Public Schools Board of Education (Hartford Board) and is sued in his official capacity.

ALLEGATIONS

### *The* **Sheff** *decision*

28.    In 1989, ten families filed a class-action lawsuit in Hartford Superior Court alleging racial discrimination and segregation in the State of Connecticut, including Hartford and its adjacent suburban communities. The families alleged that de facto segregation along racial and ethnic lines within Connecticut schools violated provisions of the Connecticut Constitution. *Sheff v. O'Neill*, 238 Conn. 1 (1996).

29.    The Connecticut Supreme Court ruled that the Connecticut Constitution required the State to provide all schoolchildren with a "substantially equal educational opportunity," and that a significant component of that requirement was access to schools that were "not substantially impaired by racial and ethnic isolation." *Sheff*, 238 Conn. at 24. The court remanded the case to the superior court with orders to enter declaratory judgment for the plaintiffs and retain jurisdiction to grant consequential relief. The court also ordered the executive and legislative branches of Connecticut to enact remedial programs.

### *Legislative response to* **Sheff**

30.     In response to the *Sheff* decision, Governor John Rowland issued Executive Order No. 10, creating the Education Improvement Panel. The panel issued a final report in January 1997, recommending multiple legislative reforms.

31.     The Connecticut Legislature passed Public Act 97-290, "*An Act Enhancing Educational Choices and Opportunities*" (Act), adopting many of the recommendations contained within the final report, and ordering Connecticut school boards to reduce racial, ethnic, and economic isolation by various methods, including interdistrict magnet school programs, charter schools, and intradistrict and interdistrict public school choice programs.

32.     The Act established a state-wide program enabling the enrollment of children in schools in urban and suburban areas beyond their neighborhood school through a lottery system. Originally named the Choice program, now known as Open Choice, the system replaced a voluntary busing system known as Project Concern that had been in operation since 1966.

33.     The Connecticut State Department of Education created the Regional School Choice Office (RSCO) to operate in partnership with school districts to conduct a lottery process for placement of children in Open Choice and magnet schools.

### *Continuing litigation and settlements in* **Sheff**

34.     In March 1998, the *Sheff* plaintiffs filed a motion for an order directing that further remedial measures be undertaken. At that time, the superior court found that the State had complied with the decision of the Connecticut Supreme Court. *Sheff v. O'Neill*, 45 Conn. Supp. 630, 667 (Super. Ct. 1999).

35.    In December 2000, the *Sheff* plaintiffs filed an order to show cause as to why the State's efforts to comply with the 1996 decision should not be held to be inadequate. After extended negotiations, a settlement was reached between the *Sheff* plaintiffs and the State that was entered as an order of the court in March 2003 (the Phase I Stipulation).

36.    The Phase I Stipulation was submitted to the Connecticut General Assembly for approval and to the Connecticut Supreme Court for entry as a court order. Conn. Gen. Stat. § 3-125*a*. The Phase I Stipulation mandated implementation of three types of voluntary interdistrict programs to lessen racial, ethnic, and economic isolation: (a) interdistrict magnet schools, (b) the Open Choice program, and (c) interdistrict cooperative programs.

37.    The Phase I Stipulation created a four-year plan through which the State was to achieve stated interim goals reducing racial isolation of Hartford's minority schoolchildren, and which included plans for eight new integrated magnet schools in Hartford. The Phase I Stipulation created a formula by which progress would be measured. This formula was calculated by (1) adding (a) the number of minority students attending public schools in districts other than Hartford to (b) the number of minority public school students attending any interdistrict magnet school, and then (2) dividing that sum by the total number of minority students in the Hartford schools. Phase I Stipulation § II(2).

38.    In January 2007, while the *Sheff* plaintiffs and the State of Connecticut were negotiating a replacement for the Phase I Stipulation, the City of Hartford

intervened in the court action. A revised settlement was not reached before the expiration of the Phase I Stipulation. The Phase I Stipulation expired in June 2007, without the State meeting the stated goals. In July 2007, the *Sheff* plaintiffs filed a motion for order enforcing judgment and to obtain a court-ordered remedy, alleging that the State had failed to comply with the requirements of the 1996 *Sheff* judgment.

39.     After further negotiations, the *Sheff* plaintiffs reached a settlement with the State, and that settlement was entered as an order of the court in April 2008 (the Phase II Stipulation). The Phase II Stipulation covered a five-year term ending June 30, 2013, and it sought to expand the use of regional magnet schools and Open Choice. The Phase II Stipulation included a "Desegregation Standard" that required "Sheff Region" interdistrict magnet schools to maintain no more than 75% minority-student enrollment to receive operating grants from the State. *See* Phase II Stipulation, § IV. The Phase II Stipulation also included a minimum goal that required at least 41% of minority students to be in "reduced isolation settings," as established by the Desegregation Standard, within five years. Phase II Stipulation, § II(C)(4).

40.     In 2013 the *Sheff* plaintiffs, the State, and the City of Hartford agreed to a one-year extension of the Phase II Stipulation, with some modifications, which was entered as an order of the court in April 2013. This agreement extended the Phase II Stipulation deadline to June 30, 2014.

41.     In 2013, the *Sheff* plaintiffs, the State, and the City of Hartford negotiated a replacement to the Phase II Stipulation that was entered as an order of

the court in December 2013 (the Phase III Stipulation). The Phase III Stipulation covered the period from July 1, 2014 to June 30, 2015. The Desegregation Standard was incorporated into the definition of "reduced-isolation setting," but it was altered to explicitly exclude all minorities except for black and Hispanic individuals. Under the Phase III Stipulation, a "Voluntary Interdistrict Program" is required to "provide a reduced-isolation setting if its enrollment is such that the percentage of enrolled students who identify themselves as any part Black/African American, or any part Hispanic, does not exceed 75% of the school's total enrollment." Phase III Stipulation, § II.M.

42. As a result of the Phase III Stipulation's new definition of "reduced-isolated," Asian students are no longer considered minority students. This reformulation was necessary because Hartford magnet schools could not enroll enough white students to meet their goals. By redefining Asian students as "reduced isolated," the Hartford magnet schools could increase their student populations.

43. In February 2015, the parties agreed to a one-year extension of the Phase III Stipulation, with modifications, through June 30, 2016. This extension was entered as an order of the court. In June 2016, the parties agreed to another one-year extension of the Phase III Stipulation, with additional modifications, through June 30, 2017, and this extension was entered as an order of the court. The Phase III Stipulation expired June 30, 2017, and the parties have not reached any further settlement agreements.

44.     Unable to reach an agreement, the *Sheff* plaintiffs on May 30, 2017, filed a motion for a temporary injunction. In opposition to that motion, the State of Connecticut sought to decrease the racial quota of non-minority students from 25% to 20%. The State presented evidence that this quota reduction would allow an additional 1,165 students to attend Hartford magnet schools. The *Sheff* plaintiffs opposed the quota reduction. The Hartford County Superior Court ruled in favor of the plaintiffs, granting their motion for a temporary injunction, and denying Connecticut's attempt to reduce the racial quota by 5%. *Sheff v. O'Neill*, No. LND CV-89-4026240-S, 2017 WL 3428676 (Hartford Cty. Superior Ct. Aug. 7, 2017).

### *Current law governing racial quota*

45.     The 75% cap on black and Hispanic enrollment, as well as the rest of the *Sheff* stipulations in their current form, have been codified and incorporated by reference into the Connecticut General Statutes.

46.     Conn. Gen. Stat. § 10-264*l*(a) requires that, "[f]or the school years commencing July 1, 2017, and July 1, 2018, the governing authority for each interdistrict magnet school program shall . . . maintain a total school enrollment that is in accordance with the reduced-isolation setting standards for interdistrict magnet schools programs, developed by the Commissioner of Education pursuant to section 1 of public act 17-172."

47.     On October 23, 2017, the Connecticut Department of Education issued its regulation incorporating the stipulated *Sheff* quota. A true and correct copy of this regulation is included as Exhibit 1.

48.     Under the regulation, a "reduced-isolation" student may not be black or Hispanic. Furthermore, "the percentage of [reduced-isolation] students enrolled in the interdistrict magnet school must equal at least 25 percent of the total school enrollment."

49.     Accordingly, under the statute and regulation, black and Hispanic students—and only black and Hispanic students—are restricted from enrolling in Hartford interdistrict magnet schools.

### *The RSCO Lottery*

50.     The Connecticut State Department of Education created the Regional School Choice Office (RSCO) to operate in partnership with school districts to conduct a lottery to determine which students may be permitted to attend interdistrict magnet schools.

51.     Approximately 20 of these magnet schools are located within the Hartford Public Schools school district.

52.     The lottery is a computer-based method of assigning to magnet schools students who have submitted a completed and on-time application.

53.     The lotteries for the 2018-2019 school year opened on November 1, 2017, and close on February 28, 2018.

54.     RSCO plans to inform current students of the lottery results by May 2018.

55.     Although touted as a random process, the RSCO lottery uses race to carefully engineer the racial makeup of magnet schools in Hartford.

56.     From the close of the lottery application process until the results are made public, State and local officials test and tweak the lottery in order to tip the scales in favor of white and Asian applicants.

57.     The lottery algorithm is not decided *ex ante*. Instead, State and local officials constantly monitor the racial makeup of the applicant pool and tinker with the lottery algorithm in order to ensure a "proper" racial balance.

58.     State and local officials give preferences to individuals from areas known to have high concentrations of white and Asian applicants.

59.     State and local officials run the lottery simulation as many times as necessary to ensure that white and Asian students rank high in the ordering.

60.     The RSCO lottery gives preference to white and Asian applicants—over black and Hispanic applicants—to attend a Hartford magnet school.

### INJUNCTIVE RELIEF ALLEGATIONS

61.     Plaintiffs incorporate and re-allege each and every allegation contained in the preceding paragraphs of this Complaint.

62.     Defendants are responsible for enforcing and/or implementing the 75% cap on black and Hispanic students in Hartford's magnet schools, and for enforcing and/or implementing the RSCO lottery, both of which violate Plaintiffs' civil rights. Because of these violations, present and future, Plaintiffs are now and will continue to suffer deprivation of their constitutional rights.

63.     If not enjoined by this Court, Defendants and their agents, representatives, and employees will continue to discriminate against children on the

basis of race, in contravention of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

64.     Pecuniary compensation to Plaintiffs or other victims of such continuing discrimination would not afford adequate relief.

65.     Injunctive relief is necessary to prevent a multiplicity of judicial proceedings on these same or similar issues.

66.     Accordingly, permanent injunctive relief is appropriate and proper.

## DECLARATORY RELIEF ALLEGATIONS

67.     Plaintiffs incorporate and re-allege each and every allegation contained in the preceding paragraphs of this Complaint.

68.     An actual and substantial controversy currently exists between Plaintiffs and Defendants as to their respective legal rights and duties. Plaintiffs contend that Defendants are discriminating on the basis of race in violation of the Fourteenth Amendment to the United States Constitution. Defendants dispute that their actions are unconstitutional.

69.     There exists a present justiciable controversy between the parties concerning the constitutionality and legality of the 75% cap on black and Hispanic students who may attend Hartford's magnet schools, and the constitutionality or legality of enforcing and implementing the RSCO lottery in a racially discriminatory manner. Plaintiffs will be directly, adversely, and irreparably harmed by Defendants' actions in enforcing and implementing the racial quota and the RSCO lottery, and by

Defendants' continuing administration, implementation, reliance, and enforcement of them now and in the future.

70.     A judicial determination of rights and responsibilities arising from this actual controversy is necessary and appropriate at this time.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### The 75% Minority Cap Violates the Equal Protection Clause of the Fourteenth Amendment

71.     Plaintiffs incorporate and re-allege each and every allegation contained in the preceding paragraphs of this Complaint.

72.     Plaintiffs are persons under 42 U.S.C. §§ 1981 & 1983.

73.     Defendants acted under the color of state law in developing, implementing, and administering the 75% cap on black and Hispanic students who may attend Hartford magnet schools.

74.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution requires that, "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. All governmental action based on race must be subjected to detailed judicial scrutiny to ensure that no person is denied equal protection of the laws.

75.     Defendants' 75% cap on black and Hispanic enrollment at Hartford magnet schools discriminates against Plaintiffs because of their race. In particular, they are disadvantaged in their ability to attend Hartford magnet schools because

their children are black and Hispanic. If they were white, they would stand a much greater chance of gaining admission to one of Hartford's magnet schools.

76.     The Defendants' actions in enforcing and administering the 75% cap on black and Hispanic enrollment is not narrowly tailored to a compelling state interest.

77.     Limiting black and Hispanic children from attending Hartford's elite magnet schools serves no compelling state interest.

78.      Defendants' cap on black and Hispanic student enrollment is not required to remedy past, intentional discrimination.

79.     Defendants' cap on black and Hispanic student enrollment is not required to secure the educational benefits that flow from racial diversity in higher education.

80.     Defendants' cap on black and Hispanic student magnet school enrollment does not serve a compelling state interest, because Defendants have not first determined that race-based measures are necessary to achieve a compelling governmental interest.

81.     The Defendants' actions in enforcing and administering the cap on black and Hispanic student magnet school enrollment is not narrowly tailored to a compelling state interest, because Defendants cannot prove that a non-racial approach would fail to promote the government objective as well at a tolerable administrative expense.

82.     The Defendants' actions in enforcing and administering the cap on black and Hispanic enrollment at magnet schools are not narrowly tailored to a compelling

state interest, because Defendant failed to exhaust race-neutral alternatives before resorting to race-based classifications.

83.     The Defendants' actions in enforcing and administering the cap on black and Hispanic enrollment at magnet schools are not narrowly tailored to a compelling state interest, because Defendant is using race as a categorical bar—and not merely a "plus" factor—in enrollment decisions.

## SECOND CAUSE OF ACTION
### Racial manipulation of the RSCO Lottery Violates the Equal Protection Clause of the Fourteenth Amendment

84.     Plaintiffs incorporate and re-allege each and every allegation contained in the preceding paragraphs of this Complaint.

85.     The current RSCO lottery process violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because State and local officials use race, overtly and covertly, so as to preference white and Asian students at the expense of black and Hispanic students.

86.     Accordingly, the current RSCO lottery process discriminates against Plaintiffs because their black and Hispanic children are less likely to be offered enrollment at a Hartford magnet school because of their race. If their children were Asian or white, they would have a greater chance of being selected to attend a Hartford magnet school via the RSCO lottery.

87.     Defendants' actions in enforcing and administering the RSCO lottery in a racially discriminatory manner are not narrowly tailored to a compelling state interest.

88.     Limiting black and Hispanic enrollment at Hartford's elite magnet schools through manipulation of the RSCO lottery serves no compelling state interest.

89.     Defendants' racial manipulation of the RSCO lottery is not required to remedy past, intentional discrimination.

90.     Defendants' manipulation of the RSCO lottery is not required to secure the educational benefits that flow from racial diversity in higher education.

91.     Defendants' racial manipulation of the RSCO lottery does not serve a compelling state interest, because Defendants have not first determined that race-based measures are necessary to achieve a compelling governmental interest.

92.     The Defendants' racial manipulation of the RSCO lottery is not narrowly tailored to a compelling state interest, because Defendants cannot prove that a non-racial approach would fail to promote the government objective as well at a tolerable administrative expense.

93.     The Defendants' racial manipulation of the RSCO lottery is not narrowly tailored to a compelling state interest, because Defendants failed to exhaust race-neutral alternatives before resorting to race-based classifications.

94.     The Defendants' racial manipulation of the RSCO lottery is not narrowly tailored to a compelling state interest, because Defendants are using race as a categorical bar—and not merely a "plus" factor—in admissions decisions.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

1.     A declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, from the Court, that the 75% cap on black and Hispanic students who may attend Hartford magnet schools, enforced and administered by the Defendants, which significantly restricts the number of black and Hispanic children who may attend magnet schools within Hartford, is unconstitutional, illegal, invalid, and unenforceable, because it discriminates on the basis of race and denies individuals equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution and federal civil rights statutes 42 U.S.C. §§ 1981 and 1983.

2.     For a permanent prohibitory injunction enjoining Defendants, their agents, employees, officers, and representatives from adopting, enforcing, attempting, or threatening to enforce the 75% cap on black and Hispanic students who may attend magnet schools in the City of Hartford, insofar as it discriminates on the basis of race and denies individuals equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution and federal civil rights statutes 42 U.S.C. §§ 1981 and 1983.

3.     A declaratory judgment, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, from the Court, that the use of race in the RSCO lottery in a manner that disadvantages black and Hispanic students, which significantly restricts the number of black and Hispanic children who may attend magnet schools within Hartford, is unconstitutional, illegal, invalid, and unenforceable, because it discriminates on the basis of race and denies individuals equal protection of the laws

in violation of the Fourteenth Amendment to the United States Constitution and federal civil rights statutes 42 U.S.C. §§ 1981 and 1983.

4.      For a permanent prohibitory injunction enjoining Defendants, their agents, employees, officers, and representatives from adopting, enforcing, attempting, or threatening to enforce the RSCO lottery in a manner that disadvantages black and Hispanic students, insofar as such manipulation discriminates on the basis of race and denies individuals equal protection of the laws in violation of the Fourteenth Amendment to the United States Constitution and federal civil rights statutes 42 U.S.C. §§ 1981 and 1983.

5.      A permanent injunction prohibiting Defendants from using race in future magnet school enrollment decisions.

6.      Attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable legal authority; and

7.      All other relief this Court finds appropriate and just.

* * *

**JURY DEMAND**

Plaintiffs demand a jury trial on all issues so triable.

DATED: February 15, 2018.

Respectfully submitted,

HARTFORD STUDENTS

_____/s/ Scott Sawyer_____
SCOTT SAWYER, Conn. Bar. No. 411919
Sawyer Law Firm
The Jill S. Sawyer Building
251 Williams Street
New London, CT  06320
Telephone:  (860) 442-8131
Facsimile:  (860) 442-4131
E-Mail:  scott@sawyerlawyer.com

JOSHUA P. THOMPSON, Cal. Bar No. 250955*
OLIVER J. DUNFORD, Ohio Bar No. 0073933*
JEREMY TALCOTT, Cal. Bar. No. 311490*
Pacific Legal Foundation
930 G Street
Sacramento, CA  95814
Telephone:  (916) 419-7111
Facsimile:  (916) 419-7747
E-Mail:  JThompson@pacificlegal.org
E-Mail:  ODunford@pacificlegal.org
E-Mail:  JTalcott@pacificlegal.org

*Counsel for Plaintiffs*

 *Motions for *Pro Hac Vice* Admission to be filed