**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| LASHAWN ROBINSON, et al., | |
| *Plaintiffs*, | |
| v. | |
| DIANNA WENTZELL, et al., | Civil Case No. 3:18-cv-00274 (SRU) |
| *Defendants*; | |
| and | |
| ELIZABETH HORTON SHEFF, et al., | |
| *Intervenors-Defendants.* | |

**MEMORANDUM OF LAW IN SUPPORT OF INTERVENORS-DEFENDANTS'
MOTION FOR THE COURT TO ABSTAIN OR, IN THE ALTERNATIVE, FOR
JUDGMENT ON THE PLEADINGS**

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ...................................................................................................... 1

I.    STANDARD OF REVIEW ............................................................................... 2

II.   STATEMENT OF FACTS ................................................................................ 3

      A.    Racial Segregation in the Hartford Region Before *Sheff* ...................... 3

      B.    Intervenors File *Sheff* in Response to the State's Persistent Failure to
            Desegregate.......................................................................................... 5

            1.    Early Inaction ............................................................................. 6

            2.    The Stipulations ......................................................................... 7

      C.    The Reduced Isolation Standard ............................................................ 8

      D.    The Lottery System .............................................................................. 10

            1.    Sorting the Applicant Pool by School........................................ 10

            2.    Sorting Applicants Within Each School's Pool .......................... 11

      E.    Recent *Sheff* Litigation......................................................................... 11

III.  ANALYSIS...................................................................................................... 13

      A.    Under the *Pullman* Abstention Doctrine, this Court Should Abstain from
            Addressing the Issues Purportedly Raised in this Case ........................ 13

      B.    Alternatively, the Court Should Grant Defendants Judgment on the
            Pleadings Because Plaintiffs Have Not Pled a Legally Viable Equal
            Protection Claim. ................................................................................ 16

            1.    The *Sheff* Remedies Do Not Classify Students Based on Race ............... 17

2.    Even if the *Sheff* Remedies Warranted Strict Scrutiny, They Are Narrowly Tailored to Serve Compelling State Interests and Thus Are Constitutional. ................................................................................... 21

        a.    The *Sheff* Remedies Further Several Compelling Interests. ......... 21

        b.    The *Sheff* Remedies Are Narrowly Tailored to Achieve These Compelling Interests. ................................................................. 25

CONCLUSION ........................................................................................................ 30

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES:**

*Am. Civil Rights Found. v. Berkeley Unified Sch. Dist.*,
   90 Cal. Rptr. 3d 789 (Ct. App. 2009) ...................................................................... 19

*Barhold v. Rodriguez*,
   863 F.2d 233 (2d Cir. 1988) ........................................................................... 25, 27

*Berry v. Sch. Dist. of Benton Harbor*,
   515 F. Supp. 344 (W.D. Mich. 1981) ...................................................................... 28

*Bethphage Lutheran Serv., Inc. v. Weicker*,
   965 F.2d 1239 (2d Cir. 1992) ............................................................................... 16

*Bethune-Hill v. Va. State Bd. of Elections*,
   137 S. Ct. 788 (2017) ........................................................................................ 25

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*,
   481 U.S. 537 (1987) ..................................................................................... 22, 23

*Bob Jones Univ. v. United States*,
   461 U.S. 574 (1983) ........................................................................................ 22

*Brewer v. W. Irondequoit Cent. Sch. Dist.*,
   212 F.3d 738 (2d Cir. 2000) ............................................................................... 22

*Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City Univ. of N.Y.*,
   502 F.3d 136 (2d Cir. 2007) .......................................................................... 22, 23

*Citizens Concerned About Our Children v. Sch. Bd. of Broward Cty.*,
   193 F.3d 1285 (11th Cir. 1999) ........................................................................... 24

*City of Richmond v. J.A. Croson Co.*,
   488 U.S. 469 (1989) ..................................................................................... 24-25

*Davis v. N.Y.C. Hous. Auth.*,
   278 F.3d 64 (2d Cir. 2002) ................................................................................ 28

*Dayton Bd. of Educ. v. Brinkman*,
   443 U.S. 526 (1979) ........................................................................................ 25

*Doe ex rel. Doe v. Lower Merion Sch. Dist.*,
   665 F.3d 524 (3d Cir. 2011) ..................................................................... 18, 19, 20

<b><u>PAGE(S)</u></b>

<u>**CASES:**</u>

*Edwards v. City of Houston*,
  37 F.3d 1097 (5th Cir. 1994) ................................................................. 23

*FCC v. Beach Commc'ns, Inc.*,
  508 U.S. 307 (1993) ............................................................................. 20

*Figueroa v. Foster*,
  864 F.3d 222 (2d Cir. 2017) ........................................................... 22, 23

*Fisher v. Univ. of Tex. at Austin*,
  136 S. Ct. 2198 (2016) ................................................................ 26-27, 29

*Fullilove v. Klutznick*,
  448 U.S. 448 (1980) ............................................................................. 25

*Greater N.Y. Metro. Food Council v. McGuire*,
  6 F.3d 75 (2d Cir. 1993) ...................................................................... 14

*Growe v. Emison*,
  507 U.S. 25 (1993) .......................................................................... 13, 15

*Grutter v. Bollinger*,
  539 U.S. 306 (2003) ...................................................... 21, 25, 26, 27, 29

*Harris v. Ariz. Indep. Redistricting Comm'n*,
  136 S. Ct. 1301 (2016) ......................................................................... 23

*Harris Cty. Comm'rs Court v. Moore*,
  420 U.S. 77 (1975) ........................................................................... 14-15

*Hayden v. County of Nassau*,
  180 F.3d 42 (2d Cir. 1999) ................................................................... 17

*Hayden v. Paterson*,
  594 F.3d 150 (2d Cir. 2010) ................................................................... 2

*Hous. Auth. of Ind. v. Buckley*,
  429 U.S. 1068 (1977) ........................................................................... 28

*King v. Ill. Bd. of Elections*,
  979 F. Supp. 619 (N.D. Ill. 1997),
  *aff'd*, 522 U.S. 1087 (1998) ................................................................. 23

**PAGE(S)**

**CASES:**

*Kromnick v. Sch. Dist. of Phila.*,
    739 F.2d 894 (3d Cir. 1984) ........................................... 24

*L-7 Designs, Inc. v. Old Navy, LLC*,
    647 F.3d 419 (2d Cir. 2011) ........................................ 2, 3

*Lewis v. Ascension Par. Sch. Bd.*,
    806 F.3d 344 (5th Cir. 2015) .................................... 19, 20

*Little Rock Sch. Dist. v. Pulaski Cty. Special Sch. Dist. No. 1*,
    597 F. Supp. 1220 (E.D. Ark. 1984) ............................... 28

*Maraschiello v. City of Buffalo Police Dep't.*,
    709 F.3d 87 (2d Cir. 2013) ........................................ 23

*Nov. Team, Inc. v. N.Y. State Joint Comm'n on Pub. Ethics*,
    233 F. Supp. 3d 366 (S.D.N.Y. 2017) ............................. 13

*Parent Ass'n of Andrew Jackson High Sch. v. Ambach*,
    738 F.2d 574 (2d Cir. 1984) ...................................... 21

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*,
    551 U.S. 701 (2007) ................................. 1, 17, 18, 24, 28

*R.R. Comm'n of Tex. v. Pullman Co.*,
    312 U.S. 496 (1941) .............................................. 13

*Reetz v. Bozanich*,
    397 U.S. 82 (1970) ............................................... 15

*Regents of Univ. of Cal. v. Bakke*,
    438 U.S. 265 ................................................. 24, 29

*Reynolds v. City of Chicago*,
    296 F.3d 524 (7th Cir. 2002) ..................................... 23

*Roberts v. United States Jaycees*,
    468 U.S. 609 (1984) .............................................. 23

*Rodriguez v. Pataki*,
    308 F. Supp. 2d 346 (S.D.N.Y. 2004)
    *aff'd*, 543 U.S. 997 (2004) ...................................... 19

v

PAGE(S)

**CASES:**

*Shaw v. Hunt,*
    517 U.S. 899 (1996) .................................................................. 24

*Sheet Metal Workers v. EEOC,*
    478 U.S. 421 (1986) ..........................................................23, 27-28

*Sheff v. O'Neill,*
    238 Conn. 1, 678 A.2d 1267 (1996) ....................................1, 5-6, 20-21

*Sheff v. O'Neill*
    45 Conn. Supp. 630, 733 A.2d 925 (Super. Ct. 1999) ........................ 7

*Sheff v. O'Neill,*
    No. LND-HHD-CV-175045066-S,
    2017 WL 4812624 (Conn. Super. Ct. Aug. 7, 2017) ...................... 12, 29

*Spurlock v. Fox,*
    716 F.3d 383 (6th Cir. 2013) .......................................... 18, 19

*Swann v. Charlotte-Mecklenburg Bd. of Educ.,*
    402 U.S. 1 (1971) .................................................................. 28

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.,*
    135 S. Ct. 2507 (2015) ................................................... 1, 19, 22

*Tunick v. Safir,*
    209 F.3d 67 (2d Cir. 2000) ............................................. 13, 15

*United States v. Bd. of Sch. Comm'rs of Indianapolis,*
    419 F. Supp. 180 (S.D. Ind. 1975)
    *reinstated on remand* 573 F.2d 400 (7th Cir. 1978) ...................... 28

*United States v. Brown,*
    352 F.3d 654 (2d Cir. 2003) .................................................. 22

*United States v. City of Yonkers,*
    96 F.3d 600 (2d Cir. 1996) .................................................. 24

*United States v. Hays,*
    515 U.S. 737 (1995) ...................................................... 17, 20

*United States v. Paradise,*
    480 U.S. 149 (1987) ................................................. 23, 25, 29

**PAGE(S)**

**CASES:**

*United States v. Sec'y of Hous. & Urban Dev.*,
   239 F.3d 211 (2d Cir. 2001) ............................................................... 15, 25-26

*United States v. Yonkers Bd. of Educ.*,
   837 F.2d 1181 (2d Cir. 1987) .................................................................... 28

*Wooden v. Bd. of Regents*,
   247 F.3d 1262 (11th Cir. 2001) ................................................................. 20

*Zuffa, LLC v. Schneiderman,*
   No. 15-CV-7624, 2016 WL 311298 (S.D.N.Y. Jan. 26, 2016) ............................... 13

**PAGE(S)**

**STATUTES, ACTS AND RULES**

34 C.F.R. § 100.3 ........................................................................................ 23

42 U.S.C. § 4000d ....................................................................................... 23

Conn. Gen. Stat. § 3-125 ................................................................................ 7

Conn. Gen. Stat. § 10-4a ................................................................................ 6

Conn. Gen. Stat. § 10-264*l*, 2018 Conn. Legis. Sen., PA 17-172 ........................... 8, 13-14

Public Act 97-290 ........................................................................................ 6

**PAGE(S)**

**OTHER AUTHORITIES**

Robert Bifulco, et al., *Can Interdistrict Choice Boost Student Achievement?*
   *The Case of Connecticut's Interdistrict Magnet School Program,*
   31 Educ. Eval. & Policy Analysis 4 (Dec. 2009) ............................................... 21

Casey D. Cobb, et al., *Evaluation of Connecticut's Interdistrict Magnet Schools* ES-4
   (Univ. of Conn. 2009) ................................................................................. 21

# INTRODUCTION

"In striving to achieve our 'historic commitment to creating an integrated society,'" the State of Connecticut (the "State") "may choose to foster diversity and combat racial isolation with race-neutral tools, and mere awareness of race in attempting to solve the problems facing inner cities does not doom that endeavor at the outset." *Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2525 (2015) (quoting *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 789 (2007) (Kennedy, J., concurring in part and concurring in judgment)). The United States Supreme Court recognizes that states "may pursue the goal of bringing together students of diverse backgrounds and races through [various] means, including strategic site selection of new schools; [and] drawing attendance zones with general recognition of the demographics of neighborhoods" without violating the federal Constitution. *Id.*

Despite this precedent, Plaintiffs contend that the State cannot pursue any race conscious programs without automatically violating the federal Constitution. This theory would effectively bar the State from ever purposefully acting to remedy the extreme racial isolation between the schools in the City of Hartford and its surrounding suburbs that the state courts found to violate the state law in *Sheff v. O'Neill,* 238 Conn. 1, 678 A.2d 1267 (1996). Plaintiffs seek to nullify the over two decades of careful efforts of the State's Judiciary, Executive, and Legislature to craft a voluntary school desegregation plan that is both consistent with the federal Constitution and affords integrated educational opportunities to nearly half of Hartford's Black and Latino students.

Plaintiffs' claims fail for two reasons.

First, because the present action threatens to usurp the state court's ongoing efforts in the *Sheff* litigation to establish the proper balance between the legal rights of Intervenors-Defendants ("Intervenors" or "*Sheff* plaintiffs") and Plaintiffs' purported interests, this Court should abstain.

1

At a pretrial conference on June 8, the state superior court set an evidentiary hearing for this November to address many of the same mixed issues of fact and law that Plaintiffs seek to raise here. Given the state proceedings, Intervenors request that this Court abstain from addressing any of Plaintiffs' claims until the state courts have fully reviewed all of these issues in the first instance.

Second, Plaintiffs fail to state a claim for challenging the lottery system and reduced isolation standard adopted as a part of the remedies in *Sheff* (the "*Sheff* remedies"). Neither the lottery system used to assign students to magnet schools, nor the reduced isolation standard deny admission to anyone based on their race. Thus, Plaintiffs' claims should be dismissed as meritless.

## I.    STANDARD OF REVIEW

In deciding a Rule 12(c) motion for judgment on the pleadings, this Court applies "the same standard applicable to dismissals pursuant to [Rule 12] (b)(6)." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011) (citation and internal quotation marks and alterations omitted). This Court must accept all factual allegations as true, but it must also set aside "allegations that are conclusory and thus are not entitled to the assumption of truth." *Hayden v. Paterson*, 594 F.3d 150, 161–62 (2d Cir. 2010).

Similarly, this Court should give no effect to legal conclusions couched as factual allegations. *Id.* For example, this Court must reject the Complaint's unfounded assertions that the reduced isolation standard is a "racial quota" or caps minority enrollment, ECF No. 1 at 2 ¶ 1; that, under the lottery, "State and local officials test and tweak the lottery in order to tip the scales in favor of white and Asian applicants," *id.* at 17 ¶ 56; and that the *Sheff* remedies do not serve compelling interests and are not narrowly tailored. *Id.* at 20-21 ¶¶ 76–83. These bare allegations and legal conclusions are not entitled to the assumption of truth. *Paterson*, 594 F.3d at 161–62.

In addition to the Complaint and Answer, the pleadings are also deemed to include "any matter of which the court can take judicial notice, . . . materials incorporated in [the pleadings] by reference, and documents that, although not incorporated by reference, are 'integral'" to the pleadings. *L-7 Designs, Inc.*, 647 F.3d at 422. Thus, state statutes, the *Sheff* stipulations, and judicial orders and opinions, and any other information of which the pleaders "had notice and which were integral to their claim" are also relevant. *Id*. Here, the judicially noticeable facts and materials incorporated into the pleading by reference include facts and documents, such as Mr. Peterson's affidavit, ECF No. 34-9, and the publicly available magnet enrollment statistics and other data, which show how the lottery and reduced isolation standard in fact work. Plaintiffs cannot use inaccurate pleadings "as a means of forestalling the district court's decision." *L-7 Designs, Inc.*, 647 F.3d at 422.

## II.    STATEMENT OF FACTS

### A.    Racial Segregation in the Hartford Region Before *Sheff*

Prior to *Sheff*, the State was well-aware of the causes of racial segregation. The State studied the problem extensively but enacted only marginal reforms with limited results.

In 1965, Hartford responded to increasing school segregation by hiring consultants from Harvard University. The consultants found that racial segregation and high poverty concentrations caused lower educational outcomes for students of color in Hartford schools. Ex. A, Harv. Univ. Grad. Sch. of Educ., Ctr. for Field Studies, *Schools for Hartford* 9 (1965). They recommended that Hartford and the State adopt an inter-district desegregation plan, including the state-funded construction of regional high schools and the creation of a state-funded inter-district program to allow Hartford students to transfer to suburban schools. *Id*. at 3. But, in response to intense white

opposition, public officials declined to pursue this plan. Because of this inaction, racial isolation in Hartford and suburban schools continued to increase.

School segregation resulted from housing discrimination. For example, in the 1950s, the State Commission on Civil Rights found that housing authorities purposely "concentrate[d] Negro families in certain projects, assigning very few, if any, to [white] projects." Ex. B, Conn. Comm'n on Civil Rights, *Racial Integration in Public Housing Projects in Connecticut* iii–iv (1955). In 1978, the Commission found that "the prevailing factor contributing to concentrated patterns of growth was . . . housing discrimination." Ex. C, Conn. Comm'n on Hum. Rts. & Opportunities, *Status of Equal Housing Opportunity* 8 (1978). A "by-product[ ] of housing discrimination [was]" racially segregated schools." *Id*. at x. Another report found that "Connecticut, by its zoning enabling legislation, [ ] made possible the practices which, together with other public and private discriminatory acts, increase[d] the degree of separation between higher and lower income groups and between whites and members of racial or ethnic minorities." Ex. D, Conn. Comm'n. on Hum. Rts., *A Study of Zoning in Connecticut* 93 (1978).

In 1988, the State Department of Education ("SDE") issued a landmark report, also coming to the conclusion that "segregated housing is one of the primary causes of [school] segregation." Ex. E, Conn. State Dep't. of Educ., *A Report on Racial/Ethnic Equity and Desegregation in Connecticut's Public Schools* 20 (Jan. 1988). The SDE report explained that private and public discrimination, "such as urban renewal, public housing, Model Cities, discriminatory mortgage programs and even federal highway construction furthered the separation of the races between city and suburb." *Id*. at 2. "Many minority children [were] forced by factors related to economic development, housing, zoning and transportation to live in poor urban communities where

4

resources are limited." *Id*. at 7. As a result, the SDE found that existing state laws and rules for intra-district desegregation were "insufficient" for integrating Hartford and other cities. *Id*. at 4, 7.

The SDE also concluded that, absent more action, the State could potentially be held legally liable for segregation in Hartford and other cities. *Id*. at 8–10. It warned that "[a]ny state that does not address the existence of segregated schools is potentially vulnerable to legal action" and that "[f]or Connecticut, the period of grace is running out." *Id*. at 4. Like the Harvard plan, the SDE urged the State to broadly expand its inter-district magnet school and student transfer programs. *Id*. at 8–12, 18–19; *see also* Ex. F, Conn. State Dep't Educ., *Quality and Integrated Education*, at 1 (1989) (urging similar actions and recognizing that "[r]acial and economic isolation have profound academic and affective consequences" and that integration could "improve[ ] achievement").

### B. Intervenors File *Sheff* in Response to the State's Persistent Failure to Desegregate.

In 1989, ten families of Black, Latino, and white school children in Hartford and its suburbs filed the *Sheff* lawsuit in state superior court. ECF No. 1 at 10 ¶ 28. The lawsuit challenged the racial and economic isolation in greater Hartford. *Id*. At that time, over 90 percent of Hartford school children were Black or Latino, and many lived below the poverty line, while the surrounding upper middle-class suburban schools were virtually all-white. *Sheff*, 678 A.2d at 1289.

After years of litigation, in 1996, the Connecticut Supreme Court held that the state constitution required the State Defendants—i.e., the Governor, State Department of Education's Commissioner and Chair, and the Attorney General—and Legislature to "take further measures to relieve the severe handicaps that burden" public school students' education because of the racial segregation in the Hartford area. *Id*. at 1270. The Court held that the "elimination of racial isolation in the schools promotes the attainment of equal educational opportunity and is beneficial to all

students, both black and white." *Id*. at 1285 (citation omitted). While the Court ordered the Legislature and Governor to put this issue at the top of their agendas, *id*. at 1290, it took years of negotiations and enforcement actions to create the current complex program of voluntary integration.

### 1.   Early Inaction

Before 1996, the SDE reports had spurred some executive and legislative attempts to address racial isolation statewide. *Id*. at 54 n.7 (Berdon, J., concurring). But the *Sheff* decision demanded additional action in Hartford. Governor John Rowland responded with Executive Order No. 10, creating the Education Improvement Panel. ECF No. 1 at 11 ¶ 30. The panel issued a final report in 1997, recommending multiple reforms. *Id*. The Legislature passed Public Act 97-290, An Act Enhancing Educational Choices and Opportunities, adopting many of the final report's recommendations, which mirrored the Harvard and SDE reports' past recommendations. The Act ordered school boards to reduce racial, ethnic, and economic isolation by various methods, including inter-district magnet school programs, charter schools, and intra-district and inter-district public school choice programs. *Id*. at ¶ 31. It established a state-wide program enabling the enrollment of children in schools in urban and suburban areas beyond their neighborhood school through lotteries. *Id*. at ¶ 32. The law amended the State's statutory identification of educational interests, providing that "in order to reduce racial, ethnic and economic isolation, each school district shall provide educational opportunities for its students to interact with students and teachers from other racial, ethnic, and economic backgrounds and may provide such opportunities with students from other communities." Conn. Gen. Stat. § 10-4a.

In March 1998, the *Sheff* plaintiffs, frustrated by the lack of progress, again sought court intervention. ECF No. 1 at 10 ¶ 34. The court concluded that, although there had been little reduction in racial isolation, the State had only begun implementing the legislative change passed in response to the 1996 decision. 45 Conn. Supp. 630, 667, 733 A.2d 925, 942–43 (Super. Ct. 1999).

2.    The Stipulations

In December 2000, the *Sheff* plaintiffs again filed a motion questioning the adequacy of the State Defendants' efforts. ECF No. 1 at 12 ¶ 35. In early 2003, after much negotiation, the *Sheff* parties entered a court-ordered "Phase I" Stipulation. Ex. G. The *Sheff* parties agreed to an expansion of the voluntary desegregation system, including the construction in Hartford of eight magnet schools that would enroll approximately 600 students each, and the utilization of the Open Choice program to place hundreds of Hartford Black and Latino students in suburban schools. *Id.*

In July 2007, the *Sheff* plaintiffs filed yet another motion alleging that the State had failed to comply with the requirements of the 1996 *Sheff* ruling. ECF No. 1 at 13 ¶ 38. After additional negotiations, in April 2008, the *Sheff* parties entered into the "Phase II" Stipulation. Ex. H. The SDE also established the Regional School Choice Office ("RSCO") to oversee the development of the system. ECF No. 1 at 8 ¶ 20. Among other things, RSCO is responsible for designing and implementing the current application system and lottery for the Open Choice suburban districts and the operators of over 40 inter-district magnet schools. Conn. Gen. Stat. § 3-125*a*.

Most recently, in December 2013, the *Sheff* parties adopted the "Phase III" Stipulation, which set forth a plan through June 2015. ECF No. 1 at 13–14 ¶ 41; *see also* ECF No. 34-2 at 1–15. The Phase III stipulation was twice extended for one year in 2015 and 2016, and again by an

August 2017 order of the state superior court. ECF No. 1 at 14–15 ¶¶ 43–44. It remains in effect until further order of the state superior court. *Id.*

### C.     The Reduced Isolation Standard

The reduced isolation standard is a measure used by the *Sheff* parties to assess whether inter-district magnet schools have diverse student bodies. The reduced isolation standard does not determine where students are assigned to schools. Rather, the race-neutral lottery determines student assignment. After the lottery has assigned students to schools, the reduced isolation standard is used to assess whether racial isolation has, in fact, been reduced.

The term "reduced isolation" was first used in the Phase I Stipulation. At that time, to be considered compliant, a magnet's enrollment of students of color could not exceed the Hartford region's student of color enrollment plus 30 percentage points. Ex. G at 2.[1] Today, a magnet is considered compliant if it has less than a 75 percent Black and Latino (hereinafter "minority") student enrollment. Conn. Gen. Stat. § 10-264*l*(a), as amended by 2018 Conn. Legis. Sen., PA 17-172; *see also* ECF No. 1 at 15. The Phase III Stipulation defines a "reduced isolation" student as a student who identifies as Native American, Asian, Alaska Native, Native Hawaiian, Other Pacific Islander, or white. ECF No. 34-2 at 5.

The reduced isolation standard is flexible. It is not a "cap" or "quota." As of October 1, 2017, the racial demographics of the 41 magnet schools range from 49 to 93 percent minority enrollment. Ex. I, October 1, 2017 Magnet Enrollment Data. Thirty schools are compliant. Another

---

[1]     The Complaint states that "under the statute and regulation, Black and Hispanic students—and only Black and Hispanic students—are restricted from enrolling in Hartford interdistrict magnet schools." ECF No. 1 at 16 ¶ 49. This is incorrect. White and other reduced isolation students are also restricted from having more than 75 percent of enrollment. Staff Report from Conn. General Assembly Legislative Program Review & Investigations Comm., *Hartford Region Public School Choice Programs* at 19 (Apr. 13, 2016), https://bit.ly/2JY7ano. Moreover, enrollment is also restricted by residency. By statute, some magnet school operators must ensure that at least 50 percent of their incoming classes are Hartford resident students. Conn. Gen. Stat. § 10-264l(c)(3)(D)(ii).

eight schools are noncompliant, but only by one to five percentage points. Three schools have over 85 percent minority enrollment.

Magnets over the 75 percent minority enrollment threshold can (and do) receive waivers. If a magnet school does not meet the reduced isolation standard:

> the Commissioner may award a magnet operating grant to the magnet school for an additional year or years if the Commissioner determines that it is appropriate to continue the grant (a) for purposes of increasing access to reduced-isolation educational opportunities or (b) because the school has other indices of diversity, such as racial, geographic, socioeconomic, percentage of special education students and EL students, achievement and other factors. If the Commissioner determines that such circumstances exist to continue the magnet grant, the school must be operating pursuant to an approved CP by December 1 of the applicable school year.

ECF 1-1 at 3. If the Commissioner determines that such circumstances exist, the school must operate pursuant to a compliance plan. *Id*.

For instance, under the Phase III Stipulation Extension, Capital Preparatory Magnet (85.7 percent minority enrollment in fall 2017), Classical Magnet (79.3 percent minority), and Capital Community College Magnet (97 percent) each had compliance plans and received waivers. Ex. I.

In the 2002–2003 school year, approximately 10 percent of Hartford students were in reduced isolation settings. Ex. G at 3. Since 2006, the percentage of minority Hartford students in reduced-isolation settings increased from 11.5 percent to 47.5 percent in 2014. Staff Report from Conn. General Assembly Legislative Program Review & Investigations Comm., *Hartford Region Public School Choice Programs* 4 (Apr. 13, 2016).

In addition, magnets operated by the Capitol Region Education Council and Goodwin College must ensure that at least half of their incoming classes at each magnet are Hartford resident students or incur a fiscal penalty. Conn. Gen. Stat. § 10-264*l*(c)(3)(D)(ii).

**D.      The Lottery System**

The RSCO works with the Open Choice suburban districts and magnet school operators (the "Operators") to conduct a lottery to determine which students are permitted to attend inter-district magnet schools and Open Choice schools in the Greater Hartford Region. ECF No. 1 at 16 ¶ 50. The lottery is a computer-based method by which RSCO admits students who have submitted a complete and on-time application to available schools. ECF No. 34-9 at 5. The Operators declare the number of seats they want to fill on a school-by-school basis, broken down by grade and by Hartford resident students and suburban-resident students. *Id*.

Applicants complete a common application and may select up to five inter-district magnet schools, in order of preference, or up to five Open Choice schools.[2] *Id*. at 4. Each school's pool is identified by the students' preference as indicated in their application—students are first added to the pool of the school they rank the highest, and then, if not admitted, added to the pool of each of their subsequent preferences (second through fifth). *Id*.

1.      Sorting the Applicant Pool by School

Students within a pool for each school are then sorted by the preferences that the Operators identify. These preferences include: (a) a sibling preference for applicants with a sibling(s) at the selected school; (b) a neighborhood or zone preference for applicants that live within a certain distance from the selected school; (c) a staff preference for applicants who have a parent working at the selected school; (d) a pathway preference for applicants transitioning from the end grade of a *Sheff* inter-district magnet school and applying to the entry grade of the selected school; and (e) an intra-district preference for applicants that live in the town that has a partnership agreement

---

[2]      "Open Choice" schools are suburban schools that permit Hartford students to transfer in. ECF No. 1 at 11 ¶ 32.

with a *Sheff* magnet school to send specific numbers of students to that school. *Id.* at 6–7. None of the Operator preferences involve sorting applicants by race.

        2.      Sorting Applicants Within Each School's Pool

After the Operator preferences are considered, the suburban applicant pool is further sorted. When reviewing the suburban applicant pool, RSCO programs the lottery to consider (a) the sending town's participation rate in school choice options; and (b) the sending town's percentage of applicants who identify as a race and ethnicity that meets the reduced-isolation definition, from highest to lowest. *Id*. at 7. Applicants are not sorted by race within their town grouping.

More recently, when it became clear that the lottery protocol was not effectively reducing racial isolation in certain schools, RSCO added a third protocol for those schools which sorts the suburban applicant pool by dividing sending towns based on the percentage of reduced isolation students in their United States Census block groups.[3] *Id*. at 8. Applicants are not sorted by race within block groups.

     **E.**     **Recent *Sheff* Litigation**

In May 2017, the *Sheff* plaintiffs moved for further relief in state superior court. ECF No. 34-4. That same day, the *Sheff* plaintiffs filed an application for a temporary injunction against the State Defendants effort to increase racial isolation by defining an "integrated" school as one where up to 80 percent, rather than 75 percent, of students are minorities. ECF No. 34-3. The *Sheff* plaintiffs also sought an order that continued all the provisions of the then-expiring Phase III Stipulation Extension. *Id*.

After a three-day evidentiary hearing, in an oral ruling from the bench and in a written opinion dated August 7, 2017, the state superior court rejected the State Defendants' attempt to

---

[3]     A Block Group is a geographical unit used by the United States Census Bureau and is the smallest geographical unit for which the bureau publishes sample data.

increase the reduced isolation standard to 80 percent. *Sheff v. O'Neill*, No. LNDCV175045066S, 2017 WL 4812624, at *5 (Conn. Super. Ct. Aug. 7, 2017). As the court explained the "lottery system is extraordinarily complex and subject to a great number of variables. Two such variables concern the cap on funding for each school and the estimated physical capacity of each school." *Id.* at *4. The superior court temporarily enjoined the State Defendants from adopting an 80 percent minority reduced isolation standard and it affirmed that the current 75 percent minority reduced isolation standard is a necessary aspect of the *Sheff* remedies. *Id.* at *5. In addition, the court extended the Phase III Stipulation until further notice of the court. *Id.* at *6.

In March 2018, the State Defendants' asked the state court to clarify the scope of any upcoming hearing on the *Sheff* plaintiffs' motion. ECF No. 34-6. The State Defendants sought "a legal ruling . . . as to what the scope of its obligations are with respect to its continuing efforts to comply with the Supreme Court mandate." *Id.* at 7. Among others, the State Defendants sought to answers to these questions:

> 1. By what standard will defendant's success or failure in meeting the Supreme Court's mandate in *Sheff* be measured?
>
> 2. Will the *Sheff* Supreme Court mandate be met if the demand among Hartford resident minority students for a school that meets the Court's standard for non-racially and ethnically isolated schools is met? If so, how should such demand be measured?
>
> 3. If demand is met, as measured by whatever standard is deemed required, would the continued existence of minority Hartford students in Hartford schools that are not reduced isolation settings violate the *Sheff* Supreme Court mandate?
>
> . . .
>
> 6. Are there federal constitutional constraints on the remedial steps the State defendants take to satisfy the *Sheff* Supreme Court mandate, and if so, what are those constraints?

*Id.* at 8-9. The *Sheff* plaintiffs filed a motion in opposition on March 26, 2018, arguing that these questions should not be determined through a Motion in Limine because these questions will be informed by the evidence and should therefore be determined after a hearing in which the court makes findings of fact. ECF No. 34-7 at 2. On May 16, 2018 the superior court agreed, issuing an order stating that "the future path for this case is dependent upon evidence received at the hearing and any limitation at this stage is unwarranted" and setting a pretrial conference for June 8, 2018. Ex. J. At that conference, the court told the *Sheff* parties to prepare for a November 2018 hearing.

## III.   ANALYSIS

### A.   Under the *Pullman* Abstention Doctrine, this Court Should Abstain from Addressing the Issues Purportedly Raised in this Case

This Court should abstain on *Pullman* grounds from adjudicating this case while the state court proceedings are pending. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 498–501 (1941). Under *Pullman*, this Court must "'sta[y] its hands,' when a constitutional issue in the federal action will be mooted or presented in a different posture following conclusion of the state-court case." *Growe v. Emison*, 507 U.S. 25, 32 (1993) (quoting *Pullman Co.*, 312 U.S. at 501). Abstention allows this Court to "avoid both unnecessary constitutional decisions and potentially erroneous determinations of state law." *Tunick v. Safir*, 209 F.3d 67, 74 (2d Cir. 2000); *see also Zuffa, LLC v. Schneiderman*, No. 15-CV-7624, 2016 WL 311298, at *7 (S.D.N.Y. Jan. 26, 2016).

Here, abstention is appropriate because (1) an issue of state law is uncertain; (2) resolution of the federal issue depends on resolving the ambiguous state law issue; and (3) the state law is susceptible to an interpretation that would avoid or modify the federal constitutional issue. *Nov. Team, Inc. v. N.Y. State Joint Comm'n on Pub. Ethics*, 233 F. Supp. 3d 366, 370 (S.D.N.Y. 2017).

First, Plaintiffs are asking this Court to determine whether the reduced isolation standard violates their rights under the federal Constitution. At the same time, the State Defendants have

asked the *Sheff* court to clarify whether the reduced isolation standard, Conn. Gen. Stat. § 10-264*l*(a), as amended by PA 17-172, is an appropriate remedy in *Sheff*. This is important because, in codifying the reduced isolation standard, the State Legislature mandated that the standard must "compl[y] with the decision of *Sheff v. O'Neill* [and] any related stipulation or order in effect." *Id*.

Although the state superior court had approved past stipulations containing that standard, It's order on the *Sheff* plaintiffs' motion for a preliminary injunction was the first time in which any Connecticut court was asked to expound on the propriety of the reduced isolation standard. The superior court's rejection of the State Defendant's premature invitation to rule on these issues before the evidentiary hearing makes it evident that issues of state law remain uncertain. Ex. J.

Thus, the reduced isolation standard is an unclear issue of state law whose interpretation is currently at issue in active state court litigation. Because *Robinson* Plaintiffs' federal "claim may be resolved by a state court choosing one among several alternative constructions it may give a state statute," *Greater N.Y. Metro. Food Council v. McGuire*, 6 F.3d 75, 77 (2d Cir. 1993), the first factor supports abstention.

The second *Pullman* factor also weights in favor of abstention. Here, the challenged statute is part of "an integrated scheme of related constitutional provisions, statutes, and regulations." *Harris Cty. Comm'rs Court v. Moore*, 420 U.S. 77, 80–81, 84 & n.8 (1975) ("Among the cases that call most insistently for abstention are those in which the federal constitutional challenge turns on a state statute, the meaning of which is unclear under state law.").

The undetermined questions of state law about the reduced isolation standard—in particular, whether the reduced isolation standard is an appropriate remedy under the Connecticut Constitution—will modify or avoid the federal constitutional question here. The state court's interpretation of the state laws governing the *Sheff* remedies under the state constitution will define

the "scope," "nature," and "continued vitality of [Plaintiffs'] federal constitutional claim." *Id*. at 85.

This Court should not "second-guess the [state superior court's] carefully considered choice of figure[s] necessary to achieve its many [remedial] purposes" before the state court has even fully considered the issue in an evidentiary hearing. *United States v. Sec'y of Hous. & Urban Dev.*, 239 F.3d 211, 220 (2d Cir. 2001) (citation omitted). This Court should therefore abstain until the upcoming state court hearing, and any later appeal, have provided the necessary clarity on what the state constitution requires to satisfy the *Sheff* decision. *See Growe*, 507 U.S. at 34 ("Absent evidence that the[ ] state [court] will fail timely to perform [its] duty, a federal court must neither affirmatively obstruct state [proceedings] nor permit federal litigation to be used to impede it.").

The third and final factor also favors abstention since the determination of these state law questions is essential to the arguments that all Defendants intend to advance in *Robinson* and could be dispositive of the case. *See* ECF No. 35-1 at 14-15; ECF No. 42 at 8-10. This Court should have the benefit of the state court's legal and factual rulings clarifying whether the reduced isolation standard is an appropriate remedy for the state law violations or whether it must be modified. Only then can this Court consider whether the reduced isolation standard warrants rational basis or strict scrutiny review and, ultimately, its constitutionality. In short, "the nub of the whole controversy may be the state constitution." *Reetz v. Bozanich*, 397 U.S. 82, 87 (1970) (abstaining where a "state court decision [] could conceivably avoid any decision under the Fourteenth Amendment and would avoid any possible irritant in the federal-state relationship.").

Finally, contrary to the position of the State Defendants, ECF No. 34-2 at 5–6, and Mr. Stallings, ECF No. 56-1 at 8-10, certification is inappropriate here because there is already existing state court litigation on an issue that the state court has already determined requires a hearing based

on the facts. When there is already existing state litigation that will likely resolve the state law issues and make federal adjudication unnecessary, federal courts should abstain rather than seek certification. *See Bethphage Lutheran Serv., Inc. v. Weicker*, 965 F.2d 1239, 1247 (2d Cir. 1992) (finding that abstention was necessary to "permit the litigation to run its orderly course in the state courts"). The State Defendants, ECF No. 34-1 at 5–6, and Mr. Stallings, ECF No. 56-1 at 8–10, cite no cases involving certification when there was an existing state proceeding underway.

Indeed, certifying questions when there is existing state court litigation on the relevant issues would, in effect, permit federal courts to bypass state court proceedings, without the proper airing of issues through state trial and appellate process, simply because the federal judiciary considers it to be more expedient. *See Tunick*, 209 F.3d at 75 (finding that abstention is appropriate where a "single adjudication by a state court could eliminate the constitutional difficulty") (citation omitted).

This case involves undetermined questions of state law that could avoid the federal constitutional question. The upcoming state court proceedings will clarify the meaning of the reduced isolation standard and its relationship to the *Sheff* remedies. The state court's ruling could eliminate the need to reach the federal constitutional issue here, or substantially alter the issues before this Court. For these reasons, this Court should abstain under the *Pullman* doctrine.

###    B.    Alternatively, the Court Should Grant Defendants Judgment on the Pleadings Because Plaintiffs Have Not Pled a Legally Viable Equal Protection Claim.

To state a claim under the Equal Protection Clause, Plaintiffs must allege that Defendants, through the *Sheff* remedies, created an impermissible racial classification. They fail to do so.

First, the *Sheff* remedies do not classify students on the basis of race. On the contrary, they use precisely the kind of race-neutral methods for achieving school diversity, including the mere consideration of school and neighborhood demographics, which the Supreme Court has recognized

16

are not subject to strict scrutiny. Likewise, the reduced isolation standard is simply a tool that the *Sheff* court and parties use to determine whether a school is racially isolated. It is not a quota. It is no different than the measures federal courts often set in discrimination cases to assess compliance.

Second, even if the *Sheff* remedies did assign students based on race (and they do not), as a matter of law, the remedies would satisfy strict scrutiny. Achieving racial diversity in schools, complying with state antidiscrimination laws and court orders, and remedying past discrimination are each compelling state interests, and the *Sheff* remedies are narrowly tailored to those interests.

This Court can decide these issues now on the pleadings. *Hayden v. County of Nassau*, 180 F.3d 42, 47 (2d Cir. 1999).

### 1.    The *Sheff* Remedies Do Not Classify Students Based on Race

Plaintiffs have brought a constitutional challenge to a system that does not assign students based on race. *See supra* at 8–11. Plaintiffs allege generally that the lottery and the reduced isolation standard discriminate against them. ECF No. 1 at 3 ¶ 3. But the lottery does not sort applicants by race, and the reduced isolation standard is not part of the admissions process at all— it is merely a means of assessing whether magnet schools are reducing racial isolation. *See supra* at 8–11. Because the State is nearly "always [ ] aware of race [when acting] . . . just as it is aware of . . . a variety of other demographic factors[,] . . . race consciousness does not lead inevitably to impermissible race discrimination." *United States v. Hays*, 515 U.S. 737, 745 (1995); *see also Hayden*, 180 F.3d at 49 ("race-conscious efforts" are not always subject to strict scrutiny).

That the *Sheff* remedies do not consider race in admitting any individual student distinguishes this case from *Parents Involved*, 551 U.S. 701, and the affirmative action cases, "which utilize[d] express racial classifications and which prevent non-minorities from competing for specific slots." *Hayden*, 180 F.3d at 49–50. "In each of those cases, the school district or

17

university policy at issue used racial classifications as the sole factor, or as one factor among many, to make determinations regarding student school assignments or admission to a higher education institution." *Doe ex rel. Doe v. Lower Merion Sch. Dist.*, 665 F.3d 524, 546 (3d Cir. 2011).

Not so here. Unlike in *Parents Involved*, no provision of state law or aspect of the lottery uses race as a factor in student assignment. *See supra* at 8–11. Instead, besides certain sibling or other preferences, the "only factor that determines a student's school choices is his or her place of residence, regardless of race." *Spurlock v. Fox*, 716 F.3d 383, 394 (6th Cir. 2013). The Chief Justice's plurality opinion in *Parents Involved* made clear that its rejection of student assignment plans that assign individual students to schools based on race "'ha[s] nothing to do' with the use of racial demographic data in policymaking, so long as the policy itself does not classify people by race." *Id.* at 394–95 (quoting *Parents Involved*, 551 U.S. at 745). Justice Kennedy's controlling opinion went further, explaining that:

> School boards may pursue the goal of bringing together students of diverse backgrounds and races through other means, including strategic site selection of new schools; drawing attendance zones with general recognition of the demographics of neighborhoods; allocating resources for special programs; recruiting students and faculty in a targeted fashion; and tracking enrollments, performance, and other statistics by race. These mechanisms are race conscious but do not lead to different treatment based on a classification that tells each student he or she is to be defined by race, so it is unlikely any of them would demand strict scrutiny to be found permissible. Executive and legislative branches, which for generations now have considered these types of policies and procedures, should be permitted to employ them with candor and with confidence that a constitutional violation does not occur whenever a decisionmaker considers the impact a given approach might have on students of different races. Assigning to each student a personal designation according to a crude system of individual racial classifications is quite a different matter; and the legal analysis changes accordingly.

*Parents Involved*, 551 U.S. at 789 (Kennedy, J., concurring in part and concurring in judgment) (citations omitted).

Thus, that the State consults racial data in designing the *Sheff* remedies to counteract the effects of housing segregation and ensure that the magnet schools are not racially isolated does not

alone transform the remedies into racial classifications warranting strict scrutiny. "[T]he Supreme Court does not believe that the mere presence of race in the mix of decision making factors, and even the desire to craft [race conscious remedies], alone automatically trigger strict scrutiny." *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 445 (S.D.N.Y.) (three-judge court), *aff'd,* 543 U.S. 997 (2004) (citation and internal alterations omitted). "Racial classification requires more than the *consideration* of racial data. If consideration of racial data were alone sufficient to trigger strict scrutiny, then legislators and other policymakers would be required to blind themselves to the demographic realities of their jurisdictions and the potential demographic consequences of their decisions." *Spurlock*, 716 F.3d at 394.

Even accepting that Defendants' primary purpose is attaining integration, such allegations have "no bearing on the facial neutrality of the [*Sheff* remedies]—at least absent evidence that the [*Sheff* remedies] are explicable only as the product of intentional segregation." *Lewis v. Ascension Parish Sch. Bd.*, 806 F.3d 344, 357–58 (5th Cir. 2015). A race-neutral student assignment plan does not transform into a racial classification or preference because it seeks to promote integration. *See Inclusive Cmtys. Project*, 135 S. Ct. at 2525 ("authorities may choose to foster diversity and combat racial isolation with race-neutral tools"); *Lower Merion*, 665 F.3d at 547 (admonishing the district court for "conflat[ing] discriminatory purpose with the consideration or awareness of race and in doing so stat[ing] an incorrect standard for determining the appropriate level of scrutiny"). Indeed, under the lottery, all students in a geographic area receive a preference, regardless of their race. The lottery "does not show partiality, prejudice, or preference to any student on the basis of that student's race." *Am. Civil Rights Found. v. Berkeley Unified Sch. Dist.*, 90 Cal. Rptr. 3d 789, 797 (Ct. App. 2009) (upholding a similar lottery plan). Because the lottery relies on a student's

19

home address and other non-racial factors, it is "necessarily race neutral." *Lewis*, 806 F.3d at 356–57.

To the extent Plaintiffs challenge the lottery's consideration of the racial demographics of a sending town or census block that argument must fail for an additional reason: within the lottery protocols, the consideration of the sending town's racial demographics does not apply to Hartford students at all. *See supra* at 10–11. Thus, as students from Hartford, Plaintiffs are not even affected by the block group preference.[4] *Cf. Hays,* 515 U.S. at 745–46 (holding that citizens who were not personally subjected to a racial classification lacked standing). In any event, "[d]esigning a policy 'with racial factors in mind' does not constitute a racial classification if the policy[,] [as here], is facially neutral and is administered in a race-neutral fashion." *Lower Merion*, 665 F. 3d at 548; *see also Hayden,* 180 F.3d at 48 (holding that a policy designed with a racial purpose is not a facial racial classification if it does not explicitly, or as applied, distinguish between people based on race).

Where, as here, there is no racial classification, the *Sheff* remedies are subject only to rational basis review. *See Lewis*, 806 F.3d at 363. Under rational basis, a classification has "a strong presumption of validity," and challengers "have the burden 'to negate every conceivable basis which might support it." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314–15 (1993) (citation omitted). The *Sheff* remedies have at least one legitimate purpose, improving educational

---

[4] To have standing, Plaintiffs must show that (1) they suffered a concrete injury; (2) there is a causal connection between the alleged injury and challenged conduct; and (3) the injury can be redressed. *Hays*, 515 U.S. at 743. Plaintiffs lack standing. Plaintiffs suffered no injury under the lottery since they were "on an equal footing with all other applicants, and [were denied admission] according to entirely race-neutral criteria." *Wooden v. Bd. of Regents*, 247 F.3d 1262, 1282 (11th Cir. 2001). As Hartford residents, Plaintiffs are not even subject to the aspect of the lottery process that considers neighborhood demographics. Because Plaintiffs were denied magnet admission in a process that "is undisputedly race-neutral, [they] cannot prove standing to assert a claim of race discrimination." *Id*. at 1283. There is also no redressability since Plaintiffs' requested relief—the use of a race neutral lottery and the removal of "caps" on minority enrollment, ECF No. 1 at 23–24 ¶¶ 1–7—are consistent with the present reality.

opportunities for all students.[5] *Sheff*, 678 A.2d at 1270. Because the Complaint makes no effort to dispel every basis for Defendants' actions, the *Sheff* remedies satisfy rational basis review.

>    2.    Even if the *Sheff* Remedies Warranted Strict Scrutiny, They Are Narrowly Tailored to Serve Compelling State Interests and Thus Are Constitutional.

Under strict scrutiny, racial classifications are "constitutional only if they are narrowly tailored to further compelling governmental interests. . . . Strict scrutiny is not strict in theory, but fatal in fact. Although all governmental uses of race are subject to strict scrutiny, not all are invalidated by it." *Grutter v. Bollinger*, 539 U.S. 306, 326–27 (2003) (internal quotation marks and citations omitted).

Because the *Sheff* remedies do not assign students based on their race, *supra* at 8–11, strict scrutiny does not apply. But, even if strict scrutiny were appropriate, the Complaint still fails on the pleadings because the *Sheff* remedies are narrowly tailored to serve compelling state interests.

>    a.    The *Sheff* Remedies Further Several Compelling Interests.

"Not every decision influenced by race is equally objectionable, and strict scrutiny is designed to provide a framework for carefully examining the importance and the sincerity of the reasons advanced by the governmental decisionmaker for the use of race in that particular context." *Id*. at 326-27. A starting point then is to determine whether any of the compelling interests recognized by courts are present here. Whether the asserted interests are compelling is a question of law. *Parent Ass'n of Andrew Jackson High Sch. v. Ambach*, 738 F.2d 574, 579 (2d Cir. 1984).

There are at least three interests here.

---

[5]    The *Sheff* magnet high schools have "positive effects on the mathematics and reading achievement" of Hartford minority students and magnet middle schools "have positive effects on reading achievement. . . . [Thus,] interdistrict magnet schools, on average, succeed in providing their students more integrated, higher achieving peer environments and [ ] they also, on average, have positive effects on achievement." Robert Bifulco, et al., *Can Interdistrict Choice Boost Student Achievement? The Case of Connecticut's Interdistrict Magnet School Program,* 31 Educ. Eval. & Policy Analysis 4, 341 (Dec. 2009); Casey D. Cobb, et al., *Evaluation of Connecticut's Interdistrict Magnet Schools* ES-4 (Univ. of Conn. 2009).

First, as the State Defendants accurately explained, ECF No. 34-1 at 10–13, Justice Kennedy's controlling opinion in *Parents Involved* expressly held that a "compelling interest exists in avoiding racial isolation, an interest that a school district, in its discretion and expertise, may choose to pursue. Likewise, a district may consider it a compelling interest to achieve a diverse student population." 551 U.S. at 797–98 (Kennedy, J., concurring in part and concurring in judgment). Thus, "five Members of th[e] [Supreme] Court agree[d] that 'avoiding racial isolation' and 'achiev[ing] a diverse student population' remain today compelling interests." *Id.* at 865 (Breyer, J., dissenting, joined by Stevens, Souter, & Ginsburg, JJ.).

Even if *Parents Involved* were ambiguous on this point (and it is not), the Second Circuit has held that reducing racial isolation is a compelling interest. *See Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 751–52 (2d Cir. 2000).

Second, the State has a compelling "interest in eliminating discrimination," which "is a 'compelling interest' 'of the highest order.'" *Figueroa v. Foster*, 864 F.3d 222, 232 (2d Cir. 2017) (quoting *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987)); *see also Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City Univ. of N.Y.*, 502 F.3d 136, 148 (2d Cir. 2007) ("[T]here is undoubtedly a compelling interest in eradicating discrimination . . . .").[6] The states, like the federal government, have a "fundamental, overriding interest in eradicating racial discrimination in education—discrimination that prevailed, with official approval, for the first 165 years of this Nation's history." *Bob Jones Univ. v. United States*, 461 U.S. 574, 604 (1983).

Connecticut has chosen to pursue this interest by outlawing all forms of racial segregation. But the State's interest in enforcing such civil rights laws is compelling even where state law offers

---

[6]     These cases involve First Amendment claims. But, like racial discrimination claims, "free exercise and establishment clause cases [ ] also turn on application of strict scrutiny." *United States v. Brown*, 352 F.3d 654, 668-69 & n.18 (2d Cir. 2003).

more protection than federal law or where the enforcement of state laws may infringe somewhat on the federal constitutional rights of others. *See Rotary Int'l*, 481 U.S. at 549; *Chi Iota Colony*, 502 F.3d at 148–49 (citing *Roberts v. United States Jaycees*, 468 U.S. 609, 624–25 (1984)). The state courts' interpretation and ongoing enforcement of the state constitution's ban on segregation is a normal "exercise of a state's historic police powers." *Figueroa*, 864 F.3d at 232.

The State's significant interest in enforcing its own laws forbidding *de facto* segregation are also analogous to its interest in complying with federal disparate impact statutes. There is a compelling interest in complying with federal laws that bar policies with discriminatory effects alone, even absent proof of racially discriminatory intent.[7] *See Harris v. Ariz. Indep. Redistricting Comm'n*, 136 S. Ct. 1301, 1306–07 (2016) (Section 5 of the Voting Rights Act); *King v. Illinois Bd. of Elections*, 979 F. Supp. 619 (N.D. Ill. 1997), *aff'd*, 522 U.S. 1087 (1998) (Section 2 of the Voting Rights Act); *Maraschiello v. City of Buffalo Police Dep't.*, 709 F.3d 87, 94 (2d Cir. 2013) (Title VII of the Civil Rights Act); *Edwards v. City of Houston*, 37 F.3d 1097, 1113 (5th Cir. 1994) (same). Because avoiding *potential* violations of federal disparate impact laws can be a compelling interest, Defendants must have a corollary interest in complying the state judiciary's *actual finding* that racial isolation in Hartford violated a state constitutional provision that likewise forbids disparate impacts.[8] *Cf. Sheet Metal Workers v. EEOC*, 478 U.S. 421, 476–77 (1986) (recognizing a compelling interest in remedying the defendant's violations of "state and federal court orders").

Indeed, the Supreme Court has long held that after "judicial, legislative, or administrative findings of constitutional or statutory violations," the state interest in using race for remedial purposes is "substantial" because "the legal rights of the victims must be vindicated" and the

---

[7]     Often the court ordered relief for violations of disparate impact laws is "no different" than the relief in intentional discrimination cases. *Reynolds v. City of Chicago*, 296 F.3d 524, 529 (7th Cir. 2002).

[8]     Federal regulations enforcing the Civil Rights Act also prohibit disparate impacts (and thus *de facto* segregation) in federally funded educational programs. *See* 42 U.S.C. § 4000d(b); 34 C.F.R. § 100.3(b)(2).

remedies "remain[ ] subject to continuing oversight to assure that it will work the least harm possible to other innocent persons." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 307–09 (Opinion of Powell, J.); *accord City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 497 (1989) (plurality). The Court also recognizes an associated compelling interest in assuring compliance with court orders in civil rights cases. *United States v. Paradise*, 480 U.S. 149, 170–71 (1987); *see also Citizens Concerned About Our Children v. Sch. Bd. of Broward Cty.*, 193 F.3d 1285, 1292 (11th Cir. 1999); *Kromnick v. Sch. Dist. of Phila.*, 739 F.2d 894, 904–05 (3d Cir. 1984) (accepting the compelling interest in assuring compliance with state court "orders to eliminate the [*de facto*] racial identifiability of schools").

The third compelling interest at issue is remedying the effects of past discrimination. "'[T]he States and their subdivisions may take remedial action when they possess evidence' of past or present discrimination, [but must] identify that discrimination, public or private, with some specificity before they . . .  use race-conscious relief." *Shaw v. Hunt*, 517 U.S. 899, 909 (1996) (quoting *Croson*, 488 U.S. at 504). In fact, in the context of school desegregation, states have an independent "duty to take the necessary steps to eliminate from the public schools all vestiges of state-imposed segregation." *United States v. City of Yonkers*, 96 F.3d 600, 622 (2d Cir. 1996) (citation and internal quotation marks omitted); *see also Parents Involved*, 551 U.S. at 737 ("[N]o one questions that the obligation to disestablish a school system segregated by law can include race-conscious remedies—whether or not a court had issued an order to that effect.").

As summarized *supra* at 3–5, before the *Sheff* decision, a series of state reports found that the extreme racial isolation in the Harford region and the accompanying disparities in educational outcomes resulted from past public and private discrimination. These state administrative and legislative findings are "generally entitled to a presumption of regularity and deferential review by

24

the judiciary." *Croson*, 488 U.S. at 500. Because the State found that racial isolation had its "roots in racial and ethnic discrimination, . . . even absent any intentional discrimination or other unlawful conduct," the State had reason to act. *Fullilove v. Klutznick*, 448 U.S. 448, 478 (1980) (plurality).

As a result, even if no one intentionally discriminated in the years preceding *Sheff*, the State's own findings about the persistent effects of past private and public discrimination in the decades before and after *Brown* established a strong basis in evidence for the *Sheff* remedies. *See Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 801 (2017) (holding that a "strong basis in evidence" defense "does not require the State to show that its action was 'actually . . . necessary' to avoid a statutory violation") (citation omitted); *see also Dayton Bd. of Educ. v. Brinkman*, 443 U.S. 526, 534–36 (1979). While the Supreme Court does "not require States . . . to compile a comprehensive administrative record" before using racial classifications for remedial purposes, *Bethune-Hill*, 137 S. Ct. at 802 (citation omitted), the State plainly did create such a record here.

**b.    The *Sheff* Remedies Are Narrowly Tailored to Achieve These Compelling Interests.**

"When race-based action is necessary to further a compelling governmental interest, such action does not violate the constitutional guarantee of equal protection so long as the narrow-tailoring requirement is also satisfied." *Grutter*, 539 U.S. at 327. School authorities may use racial classifications if the chosen means are "calibrated to fit the distinct issues raised." *Id.* at 333–34. "Context matters when reviewing race-based governmental action under the Equal Protection Clause." *Id.* at 327. Whether the *Sheff* remedies are narrowly tailored is an issue of law. *Barhold v. Rodriguez*, 863 F.2d 233, 238 (2d Cir. 1988). An examination of the context surrounding the *Sheff* remedies here makes clear that the means chosen tightly fit the compelling interest at issue.

To decide whether the *Sheff* remedies are narrowly tailored to the asserted ends, this Court must consider "(1) the necessity for relief and the efficacy of alternative remedies, (2) the

flexibility and duration of the relief, (3) the relationship of the numerical goals of the relief to the relevant labor market (or to its analog in a case involving something other than employment discrimination), and (4) the impact of the relief on the rights of third parties." *Sec'y of Hous. & Urban Dev.*, 239 F.3d at 219 (citing *Paradise*, 480 U.S. at 171). These requirements are met here.

First, the pleadings make clear that the current *Sheff* remedies were adopted only after "serious, good faith consideration of workable race-neutral alternatives." *Grutter,* 539 U.S. at 339. For decades the State failed to address the racial isolation in Hartford through race neutral means. *See supra* at 3–7. For six years after the *Sheff* ruling, the State Defendants implemented a less expansive plan that ultimately proved ineffective at providing Hartford students with integrated learning environments. ECF No. 1 at 10–12 ¶¶ 28–35. Even after the failure of earlier plans, the *Sheff* parties continue to rely on permissible race-neutral factors, such as suburban neighborhood demographics.

Narrow tailoring does not "require exhaustion of every conceivable race-neutral alternative." *Grutter,* 539 U.S. at 339. Rather, the choice of remedies to redress the violation is "a balancing process left, within appropriate constitutional or statutory limits, to the sound discretion of the [*Sheff*] trial court." *Sec'y of Hous. & Urban Dev.*, 239 F.3d at 219 (citations and internal quotation marks omitted). The *Sheff* court has "first-hand experience with the parties" and "must be given a great deal of flexibility and discretion in choosing the remedy best suited to curing the violation." *Id.* (citation omitted).

The *Sheff* court and parties developed the current system over time and it has achieved significant success. Although in 1996, every Hartford minority student was locked into a school system with over 95 percent minority enrollment, today, over 40 percent of Hartford minority students now attend a school with minority enrollment is under 75 percent. *Cf. Fisher v. Univ. of*

*Tex. at Austin*, 136 S. Ct. 2198, 2212 (2016) (holding that 54 percent and 94 percent increase in Latino and Black, respectively, student enrollment "show that consideration of race has had a meaningful, if still limited, effect on [ ] diversity"). The *Sheff* remedies have had a significant positive impact on educational outcomes and diversity without assigning individuals based on race.

Second, the *Sheff* remedies are not quotas, offer considerable flexibility, and are regularly reevaluated. "Properly understood, a 'quota' is a program in which a certain fixed number or proportion of opportunities are 'reserved exclusively for certain minority groups.'" *Grutter*, 539 U.S. at 335 (citation omitted); *see also Hayden*, 180 F.3d at 49 (distinguishing quotas from race conscious efforts that "treat[ ] all persons equally"). Unlike a quota, the reduced isolation standard is "only [a] goal[] used as a 'benchmark' for assessing progress" and compliance. *Barhold*, 863 F.2d at 238.

> As the Supreme Court has explained:
>
> Quotas impose a fixed number or percentage which must be attained, or which cannot be exceeded, and insulate the individual from comparison with all other candidates for the available seats. In contrast, a permissible goal requires only a good-faith effort to come within a range demarcated by the goal itself.

*Grutter*, 539 U.S. at 335 (citations, internal quotation marks and alterations omitted). While "there is of course some relationship between numbers and achieving the benefits to be derived from a diverse student body,. . . . [s]ome attention to numbers, without more, does not transform a flexible [ ] system into a rigid quota." *Id*. at 335–36. As the magnet enrollment data makes clear, the number of minority students in each magnet varies considerably from 49 to 93 percent minority, *supra* at 8, "a range inconsistent with a quota." *Grutter*, 539 U.S. at 336.

Also, as explained *supra* at 9, magnet schools that do not meet the reduced isolation standard routinely receive waivers. This "flexible application" of the reduced isolation standard "gives strong indication that it is not being used simply to achieve and maintain racial balance, but

27

rather as a benchmark against which the court could gauge [the State Defendants'] efforts to remedy past discrimination." *Sheet Metal Workers*, 478 U.S. at 478 & n.49.

Moreover, federal courts also regularly use "mathematical ratios" as "a starting point in the process of shaping a remedy," but not as "an inflexible requirement" or quota. *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 25 (1971). The Second Circuit has approved the use of such measures in devising remedies in both disparate impact and intentional discrimination cases. *See, e.g.*, *Davis v. N.Y.C. Hous. Auth.*, 278 F.3d 64, 80–81 (2d Cir. 2002); *United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1215 (2d Cir. 1987). And courts have used similar measures in other inter-district school desegregation cases.[9]

The lottery is likewise flexible. It never relies on a student's race to accept or deny students admission to schools. The lottery protocol gives preference to: (1) students who have a selected a school as their first choice; (2) students who have parents who teach at that school; (3) students who siblings at that school; (4) students who prefer a particular neighborhood; and (5) students who live in a particular geographic zone. Thus, race is not a factor used in the lottery protocol, much less a factor that is "determinative sanding alone." *Parents Involved*, 551 U.S. at 723.

This approach also responds to the needs of each school. For example, the neighborhood demographics of suburban applicants are considered only for the magnets that fall outside the reduced isolation standard. And only for the subset of magnets that have shown even less progress

---

[9]      *See, e.g., Little Rock Sch. Dist. v. Pulaski Cty. Special Sch. Dist. No. 1*, 597 F. Supp. 1220, 1225 (E.D. Ark. 1984) (adopting a consolidation plan to remedy inter-district segregation and setting a standard of ± 25 percent for the racial makeup of the student population); *Berry v. Sch. Dist. of Benton Harbor*, 515 F. Supp. 344, 359, 360–61 (W.D. Mich. 1981) (imposing an inter-district desegregation goal of within a ±10 percent of the regional average); *United States v. Bd. of Sch. Comm'rs of Indianapolis*, 419 F. Supp. 180, 184 (S.D. Ind. 1975) (designating a school as segregated if it exceeded 25 to 30 percent Black enrollment where Black students were about 25 percent of area's population), *judgment vacated on other grounds*, *Hous. Auth. of Ind. v. Buckley*, 429 U.S. 1068 (1977), *reinstated on remand* 573 F.2d 400 (7th Cir. 1978).

toward reducing racial isolation is the census block approach applied to suburban applicants. *See supra* at 11.

The *Sheff* remedies also contain temporal limits. *Grutter*, 539 U.S. at 342. Each stipulation had an expiration date. ECF No. 1 at 12–14 ¶¶ 38–43. These expiration dates permit the *Sheff* parties, and the state judiciary, executive and legislative branches to conduct a "regular evaluation of data and consideration of student experience, [and] tailor [their] approach in light of changing circumstances, ensuring that race plays no greater role than is necessary to meet its compelling interest." *Fisher*, 136 S. Ct. at 2210. The state court will conduct another such evaluation this year.

Third, as the state superior court recently ruled, the reduced isolation standard remains consistent with the racial demographics of the greater Hartford region. *Sheff*, 2017 WL 4812624, at *5. This Court should respect that "carefully considered choice." *Paradise,* 480 U.S. at 182.

Fourth, and finally, the lottery program "work[s] the least harm possible" to those outside the group the policy is meant to favor. *Grutter,* 539 U.S. at 341 (quoting *Bakke*, 438 U.S. at 308). Again, because no applicant is denied admission based on their race, there is no constitutional "harm."

This fourth factor also underscores the flaw in Plaintiffs' argument that the *Sheff* remedies are denying them access to integrated magnet schools. The magnets would not exist except for the *Sheff* decision. Yet Plaintiffs want to undermine the very educational opportunities that they claim to be denied the benefit of. The *Sheff* case rightly seeks to improve educational opportunities for the maximum number of students, in part, by fostering integration. Plaintiffs success here would end those efforts and thus return Hartford to its pre-*Sheff* separate and unequal mode of education.

Accordingly, the *Sheff* remedies are sufficiently narrowly tailored to satisfy strict scrutiny.

## CONCLUSION

For all these reasons, Intervenors respectfully request that this Court either abstain under

*Pullman* or dismiss this case on the pleadings.


Respectfully submitted on June 15, 2018,

/s/ Martha Stone
Martha Stone
CENTER FOR CHILDREN'S ADVOCACY
65 Elizabeth Street
Hartford, CT 06105
Phone: (860) 570-5327
mstone@kidscounsel.org

/s/ Dennis Parker
Dennis Parker
AMERICAN CIVIL LIBERTIES UNION
125 Broad Street
New York, NY 10004
Phone: (212) 519-7832
dparker@aclu.org

/s/ Deuel Ross
Deuel Ross
Cara McClellan
NAACP LEGAL DEFENSE
   & EDUCATIONAL FUND, INC.
40 Rector Street, 5th floor
New York, NY 10006
Phone: (212) 965-2200
dross@naacpldf.org
cmcclellan@naacpldf.org