## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| LASHAWN ROBINSON, et al., | Civil Action No. 3:18-cv-00274 |
| Plaintiffs, | JULY 13, 2018 |
| v. | |
| DIANNA WENTZELL, et al., | Jury Trial Demanded |
| Defendants, | |
| and | |
| ELIZABETH HORTON SHEFF, et al., | |
| Intervenors-Defendants. | |

**PLAINTIFFS' COMBINED RESPONSE TO STATE DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT; DEFENDANT STALLINGS' MOTION FOR JUDGMENT ON THE PLEADINGS; AND INTERVENORS-DEFENDANTS' MOTION FOR THE COURT TO ABSTAIN OR, IN THE ALTERNATIVE, FOR JUDGMENT ON THE PLEADINGS**

ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

TABLES OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 3

STANDARD OF REVIEW .......................................................................................... 5

ARGUMENT ............................................................................................................. 6

I.    THE STATE'S AND INTERVENOR'S ARGUMENTS ARE
      WHOLLY INAPPROPRIATE AT THIS STAGE OF LITIGATION ........................... 6

      A.  The Court May Not Rely on Matters
          Outside the Pleadings in a Rule-12(c) Motion ..................................... 6

      B.  Judicial Notice Is Improper ............................................................... 7

      C.  Additional Discovery Is Needed ......................................................... 9

II.   THE STATE HAS FAILED TO PROVE THAT ITS INTENTIONAL
      DISCRIMINATION AGAINST BLACK AND HISPANIC STUDENTS
      FURTHERS A COMPELLING GOVERNMENTAL INTEREST ............................. 10

      A.  The State Has Failed To Prove That Compliance
          with the Connecticut Constitution Is Sufficiently
          Compelling To Justify Intentional Racial Discrimination ...................... 14

      B.  The State Has Failed To Prove That Its Interest in Compliance
          with the Connecticut Supreme Court's Decision in *Sheff* Is
          Sufficiently Compelling To Justify Intentional Racial Discrimination ...... 16

      C.  The State Has Failed To Prove That Its Interest in Complying with
          the Stipulations and Orders of the Connecticut Superior Court Are
          Sufficiently Compelling To Justify Intentional Racial Discrimination ...... 17

      D.  The State Has Failed To Prove That Remedying
          *De Facto* Racial Discrimination Is a Sufficiently Compelling
          Interest To Justify Intentional Racial Discrimination ........................... 18

III.  THE STATE HAS FAILED TO PROVE THAT ITS DISCRIMINATION
      AGAINST BLACK AND HISPANIC CHILDREN IS NARROWLY
      TAILORED TO A COMPELLING GOVERNMENTAL INTEREST ......................... 21

IV.   PLAINTIFFS HAVE PLED SUFFICIENT FACTS
      WITH RESPECT TO THE HARTFORD BOARD ............................................. 27

V.    *PULLMAN* ABSTENTION IS INAPPROPRIATE ............................................. 30

      A.  Intervenors Fail To Identify an Ambiguous Issue of Connecticut Law ... 31

      B.  Resolution of the Plaintiffs' Federal Claims Does Not Turn
          on an Interpretation on the Ambiguity (if It Exists) of State Law ........... 33

C.  The Challenged Statute Is Not Susceptible to an Interpretation
That Would Avoid Plaintiffs' Constitutional Claims ................................................ 34

D.  Even if Intervenors Could Meet All Three
*Pullman* Requirements, Abstention Remains Inappropriate
Because Important Federal Rights Are at Stake ....................................................... 35

V.  CERTIFICATION TO THE CONNECTICUT
SUPREME COURT IS INAPPROPRIATE ................................................................... 36

CONCLUSION .............................................................................................................. 40

CERTIFICATE OF SERVICE ........................................................................................ 42

# TABLES OF AUTHORITIES

## Cases

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) ............................................ 14

*Arista Records, LLC v. Doe 3*, 604 F.3d 110 (2d Cir. 2010) ........................................ 27-28, 30

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................... 6, 28-30

*Baggett v. Bullitt*, 377 U.S. 360 (1964) ...................................................................... 35

*Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438 (2002) ............................................ 32

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) ........................................................ 6

*Bethphage Lutheran Serv., Inc. v. Weicker*, 965 F.2d 1239 (2d Cir. 1992) .................. 39

*Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738 (2d Cir. 2000) ...................... 19, 24

*Briggs v. Elliott*, 103 F. Supp. 920 (1952) .................................................................. 16

*Briggs v. Elliott*, 98 F. Supp. 529 (E.D.S.C. 1951) ..................................................... 16

*Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955) ...................................... 17, 36

*Brown v. Kelly*, 973 F.2d 116 (2d Cir. 1992) .............................................................. 35

*Cameron v. Bd. of Educ. of City of Bonner Springs*, 318 P.2d 988 (Kan. 1957) ........... 17

*Carley v. Wheeled Coach*, 991 F.2d 1117 (3d Cir. 1993) ............................................ 8

*Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City Univ. of N.Y.*,
     502 F.3d 136 (2d Cir. 2007) .................................................................................. 20

*City of Houston, Tex. v. Hill*, 482 U.S. 451 (1987) ...................................................... 36, 38

*City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988) ............................ 38

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) ................................. 12-13, 19, 21, 27

*Clay v. Sun Ins. Office Ltd.*, 363 U.S. 207 (1960) ....................................................... 39

*Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976) ......... 31

*Cweklinsky v. Mobil Chem. Co.*, 297 F.3d 154 (2d Cir. 2002) .................................... 40

*Dameron v. Bayless*, 126 P. 273 (Ariz. 1912) ............................................................ 17

*Dean v. City of Shreveport*, 438 F.3d 448 (5th Cir. 2006) ........................................... 24

*DiBella v. Hopkins*, 403 F.3d 102 (2d Cir. 2005) ....................................................... 37

*Donaghy v. City of Omaha*, 933 F.2d 1448 (8th Cir. 1991) ......................................... 18

*Dorman v. Satti*, 862 F.2d 432 (2d Cir. 1988) ............................................................ 37

*Edmonson v. Leesville Concrete Co.*, 500 U.S. 614 (1991) .......................................... 27

*Elec. Contractors, Inc. v. Ins. Co. of Pa.*, 11CV1432 VLB,
     2012 WL 6021321 (D. Conn. Dec. 3, 2012) .......................................................... 39

*Figueroa v. Foster*, 864 F.3d 222 (2d Cir. 2017) ....................................................... 20

*Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198 (2016)............................................13-14, 21, 24

*Freeman v. Pitts*, 503 U.S. 467 (1992) ................................................................................. 21

*Friedl v. City of New York*, 210 F.3d 79 (2d Cir. 2000) ......................................................... 9

*Giraldo v. Kessler*, 694 F.3d 161 (2d Cir. 2012) ................................................................... 7

*Goodlett v. Kalishek*, 223 F.3d 32 (2d Cir. 2000)................................................................. 39

*Gratz v. Bollinger*, 539 U.S. 244 (2003)............................................................................... 22

*Graziano v. Pataki,* 689 F.3d 110 (2d Cir. 2012) ................................................................... 6

*Greater New York Metro. Food Council v. McGuire*, 6 F.3d 75 (2d Cir. 1993) ........................ 31

*Griffin v. Sirva Inc.*, 835 F.3d 283 (2d Cir. 2016) .............................................................39-40

*Grutter v. Bollinger*, 539 U.S. 306 (2003)...........................................................13, 21-23, 26-27

*Gutierrez v. Smith*, 702 F.3d 103 (2d Cir. 2012) .................................................................. 39

*Harris Cty. Comm'rs Court v. Moore*, 420 U.S. 77 (1975)..................................................... 35

*Hartford Courant Co. v. Pellegrino*, 380 F.3d 83 (2004)...................................................... 31

*Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346 (2014).....................................................27-28

*Kent v. DaimlerChrysler Corp.*, 200 F. Supp. 2d 1208 (N.D. Cal. 2002) ..................................... 8

*Kidney v. Kolmar Labs.*, 808 F.2d 955 (2d Cir. 1987) .......................................................... 38

*Lehew v. Brummell*, 15 S.W. 765 (Mo. 1891) .................................................................... 17

*Lehman Bros. v. Schein*, 416 U.S. 386 (1974)..................................................................... 39

*Marks v. United States*, 430 U.S. 188 (1977) ...................................................................19-20

*Martin v. Wilks*, 490 U.S. 755 (1989).............................................................................17-18

*McCarthy v. OLIN Corp.*, 119 F.3d 148 (2d Cir. 1997) ......................................................... 37

*Miller v. Johnson*, 515 U.S. 900 (1995)............................................................................... 22

*Milliken v. Bradley*, 433 U.S. 267 (1977) ............................................................................ 21

*Munn v. Hotchkiss*, 795 F.3d 324 (2d Cir. 2015)................................................................. 39

*Obergefell v. Hodges*, 135 S. Ct. 2584 (2015)..................................................................... 14

*Parent Ass'n of Andrew Jackson High Sch. v. Ambach*,
   598 F.2d 705 (2d Cir. 1979)........................................................................................18-19

*Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*,
   551 U.S. 701 (2007).......................................................................2, 12-14, 19-21, 23

*Parrot v. Guardian Life. Ins. Co. of Am.*, 338 F.3d 140 (2d Cir. 2003) ...................................... 40

*Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123 (2d Cir. 2001)............................ 5

*Planned Parenthood of Dutchess-Ulster, Inc. v. Steinhaus*,
   60 F.3d 122 (2d Cir. 1995)................................................................................................ 34

*Reetz v. Bozanovich*, 397 U.S. 82 (1970) ................................................................ 34

*Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265 (1978) ................................. 13

*Reynolds v. Sims*, 377 U.S. 533 (1964) ................................................................. 15

*Ricci v. DeStefano*, 557 U.S. 557 (2009) ....................................................... 11, 21

*Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47 (2d Cir. 1992) ................ 37

*Romer v. Evans*, 517 U.S. 620 (1996) ............................................................ 14-15

*Sealed v. Sealed*, 332 F.3d 51 (2d Cir. 2003) ...................................................... 40

*Shaw v. Hunt*, 517 U.S. 899 (1996) ..................................................................... 13

*Sheff v. O'Neill*, 238 Conn. 1 (1996) ................................................ 3-4, 6, 27, 32

*Shook v. Indian River Transp. Co.*, 72 F. Supp. 3d 1119 (E.D. Cal. 2014) ............ 9

*Sternberg v. Carhart*, 530 U.S. 914 (2000) .................................................... 37-38

*Teamsters Local 617 Pension & Welfare Funds v. Apollo Group, Inc.*,
    633 F. Supp. 2d 763 (D. Ariz. 2009) ................................................................. 9

*Texas Dep't of Hous. & Cmty Affairs v. Inclusive Cmtys. Project, Inc.*,
    135 S. Ct. 2507 (2015) ...................................................................................... 21

*The Cadle Co. v. Fletcher*, 804 F.3d 198 (2d Cir. 2015) ..................................... 39

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017) ......... 15

*Tunick v. Safir*, 209 F.3d 67 (2d Cir. 2000) ......................................................... 35

*United Fence & Guard Rail Corp. v. Cuomo*, 878 F.2d 588 (2d Cir. 1989) ........... 31, 35

*United States v. Alcan Aluminum Corp.*, 315 F.3d 179 (2d Cir. 2003) ................. 20

*United States v. Brennan*, 650 F.3d 65 (2d Cir. 2011) ......................................... 18

*United States v. Leonard*, 844 F.3d 102 (2d Cir. 2016) .................................. 19-20

*United States v. Paradise*, 480 U.S. 149 (1987) ............................................. 24-26

*United States v. Sec'y of Hous. & Urban Dev.*, 239 F.3d 211 (2d Cir. 2001) ......... 25

*Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376 (2d Cir. 2000) .................. 35

*Williams v. Lambert*, 46 F.3d 1275 (2d Cir. 1995) .............................................. 32

## State Statutes

Conn. Gen. Stat. § 10-220(a) ......................................................................... 28-29

Conn. Gen. Stat. § 10-264*l*(a) ................................................. 1, 5, 10, 26, 32-33, 37-38

Conn. Gen. Stat. § 10-264*r* ................................................................................. 1

**Rules**

Fed. R. Civ. P. 12(d) ........................................................................................ 6-7

Fed. R. Evid. 201 ................................................................................................. 7

Fed. R. Evid. 201(b)............................................................................................. 7

**State Constitution**

Ala. Const. art. XIV, § 256 ................................................................................ 15

**Miscellaneous**

Black's Law Dictionary (10th ed. 2014)............................................................... 1

Calabresi, Steven G. & Perl, Michael W., *Originalism and* Brown v. Board of Education,
2014 Mich. St. L. Rev. 429 (2014) ............................................................... 15

21B *Fed. Prac. & Proc.* Evid. Rule 201 (2d ed.) ....................................... 7-8

5C *Fed. Prac. & Proc. Civ.* (3d ed.) [Wright & Miller] § 1368 ............... 5, 8

Thomas, Jacqueline Rabe, *School Choice Lottery 'Flawed,' 'Unfair'*,
Hartford Courant Digital Edition (2015), http://digitaledition.courant.com/
tribune/article_popover.aspx?guid=59a0ab0b-ce5d-4163-acf3-f9a5dd9e7ae3..................... 30

Thomas, Jacqueline Rabe & Kara, Jake, *School Choice Lottery a Mystery for
Parents as Desegregation Efforts Stall*, Connecticut Mirror (Feb. 27, 2018),
https://ctmirror.org/2018/02/27/school-choice-lottery-
mystery-parents-desegregation-efforts-wane/......................................................... 30

## INTRODUCTION

**1.** In February, eight Black and Hispanic Hartford-area families filed their federal civil-rights challenge to a state-mandated racial quota[1] that caps the percentage of Black and Hispanic children who may attend Hartford's world-class magnet schools. Compl. ¶¶ 1-3 (Dkt. No. 1). The quota requires those magnet schools to reserve 25% of their seats for white and Asian students. *Id*. ¶¶ 45-48 & Ex. 1; State Defendants' Answer (State Ans.) ¶¶ 45-48 (Dkt. No. 21); Defendant Stallings Ans. ¶¶ 45-48 (Dkt. No. 25); *see also* Conn. Gen. Stat. §§ 10-264*l*(a), 10-264*r*. Magnet schools that fail to maintain the 25% quota lose their eligibility "for a magnet school operating grant." Compl. Ex. 1, p. 1. These facts are not in dispute and cannot be disputed.

Plaintiffs also allege that the "lottery" process for selecting students for Hartford's interdistrict magnet schools is racially discriminatory. Compl. ¶¶ 50-60, 84-94. Although the State disputes that student selection is discriminatory, it admits the lottery is a "rolling process" that "seek[s] to ensure sufficient enrollment of non-black … students," and that it favors students from areas known to have high concentrations of white and Asian students. State Ans. ¶¶ 50-60.

Because of these policies, Black and Hispanic children are precluded from attending Hartford magnet schools, and seats they could otherwise fill remain empty so that the mandatory, but racially discriminatory, 25% quota can be maintained.

**2.** Plaintiffs challenge the quota and the lottery as a violation of their children's rights under the Equal Protection Clause to the Fourteenth Amendment of the United States Constitution. Compl. ¶¶ 71-94. Although Defendants[2] admit the salient facts that give rise to Plaintiffs' Complaint, they ask this Court to grant them judgment on the pleadings. *See* State Defendants'

---

[1] Conn. Gen. Stat. § 10-264*l*(a) unmistakably places a governmental limit on the percentage of Black and Hispanic students that may attend Hartford's magnet schools in a given year. *See* Quota, Black's Law Dictionary (10th ed. 2014) ("official limit on the number or amount of something that is allowed or required over a given period").

[2] Unless specially noted, "Defendants" refers to both the State Defendants and Defendant Stallings.

Memorandum in Support of Motion for Judgment on the Pleadings[3] (State Mem.) at 1 (Dkt. No. 34-1); Memorandum of Law in Support of Defendant Craig Stallings's Motion For Judgment on the Pleadings (Stallings Mem.) at 1 (Dkt. No. 56-1). Defendants also ask this Court to certify questions to the Connecticut Supreme Court. State Mem. at 4-5; Stallings Mem. at 8. Defendants' arguments are meritless.

Defendants adopted and continue to enforce a racially discriminatory policy that denies available seats in Hartford's magnet schools to Black and Hispanic children solely because of their race. This race-based policy is presumptively unconstitutional and can be upheld *only if* the government proves that it is narrowly tailored to a compelling government interest. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007). Defendants cannot come close to satisfying this high bar at the pleading stage. The voluminous "evidence" submitted by Defendants in their briefs cannot be considered by this Court at this time and, regardless, the policy fails to satisfy strict scrutiny as a matter of law. The Defendants' motions for judgment on the pleadings should be denied.

Nor should the Court certify any questions to the Connecticut Supreme Court. Plaintiffs raise *federal* constitutional challenges to a *state* law—and no party to this lawsuit disputes the meaning of that law. The State's hope that the Connecticut Supreme Court will excuse their unconstitutional conduct is no basis for this Court to certify. Plaintiffs have every right to a federal court's determination of their federal claims; any delay would be a grave injustice to Hartford's Black and Hispanic families.

Defendant-Intervenors also ask this Court to grant judgment on the pleadings. *See* Memorandum of Law in Support of Intervenors-Defendants' Motion for the Court to Abstain or,

---

[3] In the alternative, the State Defendants asked for summary judgment. The motion for summary judgment was denied without prejudice at the parties' May 15 Status Conference from the bench.

in the Alternative, for Judgment on the Pleadings (Intervenors Mem.) at 2 (Dkt. No. 58-1). Their motion is based entirely on 600-plus pages of documents from outside the pleadings. Even if the Court could properly consider these documents at this stage, nothing in them purports to show, or could show, that the facially discriminatory quota challenged by the Plaintiffs satisfies strict scrutiny.

Intervenors also ask this Court to abstain from hearing Plaintiffs' federal claims. *See* Intervenors Mem. at 13-16. Yet Intervenors fail to satisfy any of the *Pullman* factors that would permit this Court to abstain. Even if they could, this Court should refuse to abstain because important federal rights are at stake. There is no basis for abstention.

**3.** Plaintiffs' children—along with thousands of other Black and Hispanic children in Hartford—are being shut out of Hartford's best schools only because of their race. While the State and Intervenors quibble over the arbitrary quota (20% or 25%) for white and Asian seats, Black and Hispanic children are permanently deprived of the education they deserve. They have been for years. These children are relegated to Hartford's failing neighborhood schools—which are *more* segregated than ever—while seats in the best schools are reserved for white and Asian kids or, worse, left empty.

Time is of the essence. This Court should deny the motions for judgment on the pleadings so this case can move forward. Hartford children have already waited far too long.

## STATEMENT OF FACTS

In *Sheff v. O'Neill*, the Connecticut Supreme Court ruled that the Connecticut Constitution required the State to provide all schoolchildren with a "substantially equal educational opportunity." 238 Conn. 1, 24 (1996). A significant component of that requirement was access to schools that were "not substantially impaired by racial and ethnic isolation." It remanded the case

to the superior court with orders to enter declaratory judgment for the plaintiffs and retain jurisdiction to grant consequential relief. The court also ordered the executive and legislative branches of Connecticut to enact remedial programs. *See* Compl. ¶¶ 28-29.

Public Act 97-290, "*An Act Enhancing Educational Choices and Opportunities*," required Connecticut school boards to reduce racial isolation by creating interdistrict magnet school programs. Compl. ¶ 31; State Ans. ¶ 31; Stallings Ans. ¶ 31; Intervenors Ans. ¶ 31 (Dkt. No. 42). The Act also established a statewide program enabling the enrollment of children in schools in urban and suburban areas beyond their neighborhood schools to be administered through a lottery system. *Id*. ¶ 32. The Connecticut State Department of Education created the Regional School Choice Office (RSCO) to partner with school districts to conduct a lottery process for placement of children in magnet schools. Compl. ¶ 33; State Ans. ¶ 33.

Meanwhile, the Intervenors and the State entered into three stipulations concerning potential remedies in response to the *Sheff* decision. *See* Compl. ¶¶ 34-44. The Phase I Stipulation sought to reduce racial isolation by establishing eight new integrated magnet schools in the region. *Id.* ¶ 37. The Phase II Stipulation conditioned the schools' funding on their acceptance of a racial quota. Under the Stipulation's "Desegregation Standard," interdistrict magnet schools in the region must limit minority-student enrollment to 75% or forgo operating grants from the State. *Id*. ¶¶ 39-40. The Phase III Stipulation incorporated the Desegregation Standard into the definition of "reduced isolation setting," but altered the standard to exclude all minorities except for Black and Hispanic students. Compl. ¶ 42.[4]

---

[4] Under the Phase III Stipulation, Asian students are not considered to be minorities when a school's enrollment is reviewed to see if it meets the 75-25 ratio (making it easier to meet the quota), but they are counted as minorities for purposes of determining the racial makeup of Hartford's schools as a whole (enhancing the district's "diversity"). State Ans. ¶ 42.

The 75% cap on Black and Hispanic enrollment, and the rest of the *Sheff* stipulations in their current form, have been codified and incorporated by reference into the Connecticut General Statutes. State law requires that, "[f]or the school years commencing July 1, 2017, and July 1, 2018, the governing authority for each interdistrict magnet school program shall . . . maintain a total school enrollment that is in accordance with the reduced-isolation setting standards for interdistrict magnet school programs, developed by the Commissioner of Education pursuant to section 10-264*r*." Conn. Gen. Stat. § 10-264*l*(a).

The law also requires the State Education Department to develop reduced-isolation setting standards. These were issued in October 2017. *See* Compl. ¶ 47, Ex. 1. Under this regulation, a "reduced-isolation" student may not be Black or Hispanic. And "the percentage of [reduced-isolation (*i.e.*, white and Asian)] students enrolled in the interdistrict magnet school must equal at least 25 percent of the total school enrollment." *Id*.

## STANDARD OF REVIEW

A motion for judgment on the pleadings (Rule 12(c)) is subject to the same standard of review as a motion to dismiss (Rule 12(b)). *Patel v. Contemporary Classics of Beverly Hills*, 259 F.3d 123, 126 (2d Cir. 2001). *See also generally* 5C *Fed. Prac. & Proc. Civ.* (3d ed.) [Wright & Miller] § 1368. This Court "is required to view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the [Plaintiffs]." *Id*. (footnotes omitted). Further, "all of the well pleaded factual allegations in the [Plaintiffs'] pleadings are assumed to be true and all contravening assertions in the movant's pleadings are taken to be false." *Id*. Federal courts are "unwilling to grant a motion under Rule 12(c) unless the movant *clearly establishes* that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Id*. (emphasis added).

The moving parties must show that Plaintiffs' complaint lacks "sufficient factual matter to 'state a claim to relief that is plausible on its face.'" *Graziano v. Pataki,* 689 F.3d 110, 114 (2d Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). Claims have "facial plausibility" when the complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

## ARGUMENT

### I.   THE STATE'S AND INTERVENOR'S ARGUMENTS ARE WHOLLY INAPPROPRIATE AT THIS STAGE OF LITIGATION

#### A.  The Court May Not Rely on Matters Outside the Pleadings in a Rule-12(c) Motion

Both the State and Intervenors raise a number of matters from outside the pleadings. The State attaches to its Motion the affidavit of Glen Peterson which contains assertions about how the lottery is (allegedly) conducted. These assertions were not included in Plaintiffs' complaint, and the State concedes that the affidavit may not be considered without converting the State's Motion into a Motion for Summary Judgment. *See* State Mem. at 7-8. *See also* Fed. R. Civ. P. 12(d). The Court denied the State's motion for summary judgment from the bench, and Peterson's affidavit may not be considered on Motions for Judgment on the Pleadings.

Intervenors too offer allegations from outside the pleadings related to the lottery and the "reduced isolation standard." They proffer several exhibits (Exhibits A through F) that are unrelated to the parties' pleadings. Intervenors rely extensively on these outside-the-record exhibits to support their assertions that racial segregation allegedly (1) existed in the Hartford region decades before the Connecticut Supreme Court's decision in *Sheff*, and (2) caused various socio-economic problems. *See* Intervenors Mem. at 3-5. Because all of these documents come

from outside the pleadings, they cannot be considered at this stage. *See* State Mem. at 7-8; Fed. R. Civ. P. 12(d).

### B.  Judicial Notice Is Improper

Intervenors claim that the Court may take judicial notice of student enrollment and various "studies" and "findings" concerning segregation in Hartford—all matters of dispute. According to Federal Evidence Rule 201, a court "may" judicially notice a fact only if the party seeking notice can show[5] that the fact is "not subject to reasonable dispute because" either (1) it is generally known within the trial court's territorial jurisdiction, or (2) it can "be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Because Intervenors' Exhibits A-F and I are subject to reasonable dispute, the Court cannot take judicial notice of them.[6]

First, Exhibits A through F are irrelevant. *See* Fed. R. Evid. 201 advisory committee's note (court may properly take judicial notice of "the facts *of the particular case*") (emphasis added). *See also Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012) ("We also take judicial notice of *relevant* matters of public record.") (emphasis added) (citation omitted). They contain information from as far back as 1955 and only as recent as 1989. They are studies concerning the alleged effect of racial segregation on school enrollment. For example, Intervenors claim that "[s]chool segregation resulted from housing discrimination." Intervenors Mem. at 4 (citing Exs. B-E). These assertions—even if true—are irrelevant to Plaintiffs' claims which allege that Connecticut and the Hartford Schools prevent Black and Hispanic children from attending interdistrict magnet schools

---

[5] *See* 21B *Fed. Prac. & Proc.* Evid. Rule 201 (2d ed.) ("The burden of proving "indisputability" rests on the party requesting judicial notice.") (footnote omitted). Further, according to the Advisory Committee, "a high degree of indisputability is the essential prerequisite." Therefore, the proposed fact "must be one that only an unreasonable person would insist on disputing." *Id*. (citations omitted).

[6] The Intervenors remaining exhibits (G, H, and J) are orders of the superior court—two of which (Exhibits G and H) were referred to in Plaintiffs' Complaint. Plaintiffs do not object to the Court's consideration of Exhibits G, H, and J for purposes of the Intervenors' Motion for Judgment on the Pleadings.

because of their race. Whether past (neighborhood or housing) segregation caused Hartford's current population to be overwhelmingly minority is not relevant to those claims.

Further, even if Exhibits A-F were relevant—they are not—they, and Exhibit I, contain information that is *not* generally known within the territorial jurisdiction of this Court. Exhibits A-F are specialized (opinion) studies about complex socio-economic circumstances which are inappropriate for judicial notice. *See* 21B *Fed. Prac. & Proc.* Evid. § 5104 (judicial notice is inappropriate when the court would rely on inferences drawn by others, such as opinions on causation and socio-political trends) (citations omitted). Exhibit I purportedly contains enrollment data of Hartford schools. Intervenors do not even attempt to show that this kind of information is generally known in Connecticut.

Finally, none of Exhibits A-F or Exhibit I can "be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." For example, Exhibit B is a "finding" by the Connecticut Commission on Civil Rights from 1955—over a half-century before the facts at issue in this case.[7] *See* Wright & Miller § 5104; *see also Carley v. Wheeled Coach*, 991 F.2d 1117 (3d Cir. 1993) (refusing to take notice of government test on vehicle rollovers because results are not "readily provable through a source whose accuracy cannot be reasonably questioned"). These exhibits also constitute hearsay and, rather than being proper evidence of factual allegations, are properly the subject of expert discovery. *See*, *e.g.*, *Kent v. DaimlerChrysler Corp.*, 200 F. Supp. 2d 1208 (N.D. Cal. 2002).

Nor can Exhibit I—a spreadsheet purportedly containing enrollment data of Hartford schools—"be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." In a supporting declaration, Intervenors' attorney declares simply that Exhibit I

---

[7] Similarly, Exhibit A is a Harvard study from 1965 and Exhibits C and D were issued in 1978.

"is a true and correct copy of the spreadsheet titled *Sheff Interdistrict Magnet School Enrollment Data,* dated 2017." *See* Declaration of Deuel Ross ¶ 11 (Dkt. No. 58-2). But the declaration provides no source for the information; it does not even state if the information is publicly available, whether the spreadsheet itself is a public document, or whether counsel (or someone else) created the spreadsheet using publicly available information. Nor does the Exhibit itself identify the source of the information. *See* Ex. I (Dkt. No. 58-11). Without *any* indicia of reliability, the Court cannot take judicial notice of Exhibit I. *See, e.g.*, *Shook v. Indian River Transp. Co.*, 72 F. Supp. 3d 1119 (E.D. Cal. 2014); *Teamsters Local 617 Pension & Welfare Funds v. Apollo Group, Inc.*, 633 F. Supp. 2d 763 (D. Ariz. 2009).

### C.  Additional Discovery Is Needed

While the information from outside the pleadings may not be considered by the Court here, it confirms that this case requires additional discovery. Mr. Peterson's affidavit raises as many questions as it purportedly answers. *Friedl v. City of New York*, 210 F.3d 79, 84 (2d Cir. 2000) (error to rely on "factual contention ... contained in a declaration"). After describing the many iterations of the lottery process (*see* State Ans., Ex. H ¶¶ 12-27), Mr. Peterson concludes the affidavit by effectively admitting that the State uses race to meet the arbitrary racial quotas required by the *Sheff* mandate.

For example, Mr. Peterson states that before running the "actual lottery," RSCO "runs various lottery simulations to ensure protocols are working properly and *schools will meet the RI [Reduced-Isolation] Standard*. An operator *will adjust* protocols and/or *seat declarations* if a school is not projected to meet the RI Standard based on the simulation." State Ans., Ex. H ¶ 28 (emphasis added). The school operators "must carefully fill seats through the *various rounds of the lottery* to ensure educational benefit, resource efficiency, fiscal integrity, and *compliance with*

*the RI Standard.*" *Id.* ¶ 32 (emphasis added). And they "must consider the racial and ethnic demographics of applicants in determining whether to fill available seats and how many to fill. RSCO collaborates with operators on filling seats as it relates to school compliance and *will restrict the number of seats filled*, if any, if adding students from the waitlist will negatively affect the school's compliance with the [Reduced-Isolation] Standard." *Id.* (emphasis added). Mr. Peterson's (improper) affidavit confirms the key allegations of Plaintiffs' Complaint. *See* Compl. ¶¶ 50-60.

Regardless, with respect to the Motions for Judgment on the Pleadings, assuming all of Plaintiffs' allegations to be true, and all contravening assertions in Defendants' answers to be false, and construing all inferences in the light most favorable to the Plaintiffs, this Court should conclude that material issues of fact remain to be resolved and that Defendants are not entitled to judgment as a matter of law.

## II. THE STATE HAS FAILED TO PROVE THAT ITS INTENTIONAL DISCRIMINATION AGAINST BLACK AND HISPANIC STUDENTS FURTHERS A COMPELLING GOVERNMENTAL INTEREST

Connecticut discriminates against Black and Hispanic students by distributing burdens and benefits on the basis of race. Connecticut law instructs magnet schools to "maintain a total school enrollment that is in accordance with the reduced-isolation setting standards for interdistrict magnet school programs" developed by the Commissioner of Education. Conn. Gen. Stat. § 10-264*l*(a). The State Education Department's standards specify that a "reduced isolation" student may not be Black or Hispanic and that "the percentage of [reduced-isolation (*i.e.*, white or Asian)] students enrolled in the interdistrict magnet school must equal at least 25 percent of the total school enrollment." Compl. ¶ 47, Ex. 1. Interdistrict magnet schools in the "Sheff Region" must comply with the 75% cap on Black and Hispanic student enrollment or forgo operating grants from the State. *Id.* ¶¶ 39-40.

Intervenors are thus incorrect when they assert that the racial quotas do not classify students based on race.[8] *See* Intervenors' Mem. at 17-21. Many of their assertions involve factual questions and are inappropriate for resolution at this stage of litigation, especially where they are contradicted by Plaintiffs' complaint. Compare *id.* at 17 (arguing the Connecticut laws and regulations do not consider race in admitting any individual student), *with* Compl. ¶ 55 ("the RSCO lottery uses race to carefully engineer the racial makeup of magnet schools"); ¶ 56 ("State and local officials test and tweak the lottery in order to tip the scales in favor of white and Asian applicants.").

Intervenors are also mistaken when they assert that "the reduced isolation standard is not part of the admissions process at all—it is merely a means of assessing whether magnet schools are reducing racial isolation." Intervenors Mem. at 17. As noted, interdistrict magnet schools must comply with the reduced isolation standard or lose state funding.[9] Compl. ¶¶ 39-40. As a result, Hartford magnet schools partner with the RSCO to determine admissions in a way that conforms to Connecticut's desired racial balance. *See* Stallings Ans. ¶¶ 50-51 (admitting that admissions to magnet schools in Hartford are made by the School Board in partnership with the RSCO which operates the challenged lottery process). The reduced-isolation standard thus distributes benefits and burdens on the basis of race.

---

[8] Defendant Peterson admitted the RSCO "runs various lottery simulations to ensure . . . schools will meet the RI [Reduced-Isolation] Standard. An operator will adjust protocols and/or seat declarations if a school is not projected to meet the RI Standard based on the simulation." State Ans., Ex. H ¶ 28. While this troubling statement from outside the pleadings is unfit for consideration for purposes of ruling on the motions for judgment on the pleadings, it shows that discovery is essential and will rebut Intervenors' unfounded assertions that the racial quotas here involve only "race-neutral methods for achieving school diversity." Intervenors' Mem. at 16.

[9] This alone triggers strict scrutiny. The government discriminates on the basis of race when it forces others to either discriminate on the basis of race or lose funding. *See Ricci v. DeStefano*, 557 U.S. 557, 594 (2009) (Scalia, J., concurring) (noting that government is prohibited from "mandating that third parties . . . discriminate on the basis of race").

Only the most compelling of interests may justify government action that distributes benefits and burdens on the basis of race. A "mere recitation of a 'benign' or legitimate purpose for a racial classification is entitled to little or no weight." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989). Here, the State has failed to put forth an independent compelling interest that would justify the denial of admission to students based solely on their race, and its motion must be denied.

Indeed, it is difficult to discern what the State even considers to be the precise compelling interest for its facially discriminatory policy. Its motion begins by asserting that discrimination is compelling because it is "duty-bound to obey such mandates … that were taken to comply with *Sheff* and the Connecticut Constitution and were approved and/or ordered by the Connecticut Superior Court." State Mem. at 2. Within those two sentences, however, are at least four potentially distinct interests: (1) The Connecticut Constitution; (2) The Connecticut Supreme Court's decision in *Sheff*; (3) Orders by the Superior Court; and (4) Agreements approved by the superior court. The State later asserts three additional "compelling" interests: "the *de facto* racial, ethnic, and economic isolation in the Hartford schools." *Id*. at 13.

While the State's purported interests are certainly related, they are also plainly distinct. Vague nods to at least seven distinct, but related, interests are not sufficient to prove that discriminating against Black and Hispanic children furthers a compelling governmental interest— not least because the Supreme Court has *never* recognized any of those seven interests as sufficiently compelling to justify discrimination on the basis of race.

To date, the Supreme Court has recognized only two interests as sufficiently compelling to justify race-based classifications: (1) remedying the past effects of *de jure* discrimination; and (2) diversity in higher education. *Parents Involved*, 551 U.S. at 720-22. The State admits that its

12

racial quota is not necessary to remedy past, intentional discrimination, *see* State Ans. ¶ 78 (admitting that the "cap on black and Hispanic student enrollment is not required to remedy past, intentional discrimination"), and this case does not involve higher education. Moreover, even where the Supreme Court has recognized a governmental interest as sufficiently compelling to justify race-based discrimination, the Court has refused to accept the government's *ipse dixit* as to the existence of the compelling interest. *See Fisher v. Univ. of Tex. at Austin*, 136 S. Ct. 2198, 2210-11 (2016) (reviewing the record to determine if university's asserted interest in diversity was sufficiently concrete). Instead, the Court has consistently required the government—before it resorts to racial classifications—to identify the purpose of the racial classification with precision. *See Shaw v. Hunt*, 517 U.S. 899, 909 (1996); *Croson*, 488 U.S. at 504.

Specificity is required because the means chosen to accomplish the goal must (1) "work the least harm possible," *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 308 (1978) (op. of Powell, J.), and (2) be narrowly tailored to fit the interest "'with greater precision than any alternative means.'" *Grutter v. Bollinger*, 539 U.S. 306, 379 (2003) (Rehnquist, C.J., dissenting) (citation omitted). Without a clear understanding of the goal of the State's racial quota here, it is impossible to scrutinize whether the chosen means serve to secure the alleged benefits in the least harmful way possible. *See Croson*, 488 U.S. at 510.

And if this Court is going to recognize one of the State's asserted interests as sufficiently compelling to justify racial discrimination, surely it would need to strongly weigh the evidence before coming to such a conclusion—something it cannot do on a motion for judgment on the pleadings. For example, in *Grutter*—where the Supreme Court recognized student-body diversity in higher education as compelling—the Court had an extensive record upon which to base its finding. 539 U.S. at 328-33. The same is true of *Fisher*, *Parents Involved*, and other cases where

the government uses race. *See, e.g.*, *Fisher*, 136 S. Ct. at 2211-14 (delving into extensive factual record); *Parents Involved*, 551 U.S. at 725-33 (plurality op.) (same); *Parents Involved*, 551 U.S. at 782-87 (Kennedy, J., concurring) (same); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995) (remanding an already developed factual record for further factual development to determine if asserted interest is compelling).

Without a more fully developed record, this Court cannot determine if the State's racial discrimination—whether narrowly tailored or not—furthers a compelling governmental interest. Indeed, without a fully developed record it is impossible to determine what goal or purpose the State is even trying to achieve, much less whether its racial discrimination actually furthers that goal. For purposes of this motion for judgment on the pleadings, it should suffice that the State has not identified with precision, much less proven, that it has an interest sufficiently compelling to justify its overt discrimination against Black and Hispanic children. The State's motion is wholly improper and should be denied on that basis alone. However, none of the kitchen-sink interests the State asserts are compelling, and none should be accepted by this Court.

### A. The State Has Failed To Prove That Compliance with the Connecticut Constitution Is Sufficiently Compelling To Justify Intentional Racial Discrimination

A state interest is not "compelling" by virtue of its inclusion in a state's constitution. Just recently the Supreme Court struck down—under the Equal Protection Clause—state constitutional provisions that prohibited same-sex marriage. *See Obergefell v. Hodges*, 135 S. Ct. 2584, 2604-05 (2015). And, in *Romer v. Evans*, the Supreme Court struck down a provision of the Colorado Constitution that prohibited local and state government from recognizing homosexuality as a protected class. Although the provision was enshrined in the Colorado Constitution, the Court held that it was not even a *legitimate* state interest under the rational basis test. 517 U.S. 620, 632-34

(1996); *see also Reynolds v. Sims*, 377 U.S. 533, 583-87 (1964) (striking down various state constitutional provisions under the Equal Protection Clause). "When there is an unavoidable conflict between the Federal and a State Constitution, the Supremacy Clause of course controls*." Reynolds*, 377 U.S. at 584.

Here, the State is relying on compliance with the Connecticut Constitution to justify its decision to prohibit Black and Hispanic students from attending Hartford's world-class magnet schools. It wasn't too long ago that many state constitutions required segregated schools. *See* Steven G. Calabresi & Michael W. Perl, *Originalism and* Brown v. Board of Education, 2014 Mich. St. L. Rev. 429, 497-509 (2014) (compiling state constitutional provisions that mandated segregation). Alabama's Constitution *still* demands that schools be segregated on the basis of race. *See* Ala. Const. art. XIV, § 256. Those state constitutional provisions, however, provide no cover for laws or policies that would attempt segregation today. The United States Constitution forbids it. Nor does the Connecticut Constitution provide cover for state officials to enforce their discriminatory racial quota on Hartford's Black and Hispanic children today. Put simply, complying with a state constitution does not make the governmental purpose "compelling" under equal protection law. *See Romer*, 517 U.S. at 632 ("[We] required that the classification bear a rational relationship to an *independent* and legitimate legislative end . . . ." (emphasis added)); *see also Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2022-25 (2017) (compliance with Missouri Constitution does not constitute compelling interest to justify denial of First Amendment rights).

**B. The State Has Failed To Prove That Its Interest in Compliance with the Connecticut Supreme Court's Decision in *Sheff* Is Sufficiently Compelling To Justify Intentional Racial Discrimination**

The same rationale also defeats the State's argument that compliance with the Connecticut Supreme Court's decision in *Sheff* constitutes a compelling interest. *See, e.g.*, State Mem. at 21 ("[T]he *Sheff* mandate itself constitutes a compelling governmental interest.").[10] But Defendants offer no citation for the extraordinary proposition that these stipulations and orders can independently create a compelling interest.[11] At heart, Defendants' argument is impossibly circular: the *Sheff* stipulations that establish the use of racial quotas in admissions also provide the compelling interest that justifies the use of racial quotas in admissions. This cannot be so.

As stated above, a state may not rely on its own constitution to undermine the guarantees mandated under the Federal Constitution. *A fortiori* a state may not rely on a state court's interpretation of the state constitution to reach the same end. Instead, any compelling interest must meet *federal* constitutional standards which cannot be subverted by state constitutions, statutes, or court rulings—as the Supreme Court's decision in *Brown v. Board of Education* makes plain.

For example, in *Briggs v. Elliott*, 98 F. Supp. 529 (E.D.S.C. 1951), the court upheld South Carolina's constitutional and statutory provisions requiring segregation in public schools. In reaching that conclusion, the court relied in part on similar state constitutions and statutes—and state supreme court rulings. *Id.* at 534-35, later proceeding at 103 F. Supp. 920 (1952). According to the district court, "the validity of legislatively requiring segregation in the schools has been upheld [by state courts] wherever the question has been raised." *Id.*, 98 F. Supp. at 534 (citing,

---

[10] As Plaintiffs best understand the State's argument, the "*Sheff* mandate" is defined as the series of stipulations, motions, and injunctions approved or ordered by the superior court in the wake of the Connecticut Supreme Court's *Sheff* decision. State Mem. at 2.

[11] To be sure—and as Defendants note—the dearth of cases addressing these issues may be at least partially explained by the unique nature of the *Sheff* decision among the 50 states. No other state requires race-based remedies for *de facto* segregation. State Mem. at 9 n.3. Plaintiffs were also unable to locate any case holding that compliance with a state court decision constitutes a compelling interest.

*inter alia*, *Dameron v. Bayless*, 126 P. 273 (Ariz. 1912); *Lehew v. Brummell*, 15 S.W. 765 (Mo. 1891)). But those state supreme court decisions were no obstacle to the vindication of federal equal protection rights in *Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294 (1955). *See also Cameron v. Bd. of Educ. of City of Bonner Springs*, 318 P.2d 988, 990 (Kan. 1957).

All told, the State may not rely on *state* law—Connecticut's constitution, statutes, or its supreme court's rulings—as a compelling state interest to justify a racial quota that violates the *federal* equal protection rights of Black and Hispanic students across Hartford.

### C. The State Has Failed To Prove That Its Interest in Complying with The Stipulations and Orders of the Connecticut Superior Court Are Sufficiently Compelling To Justify Intentional Racial Discrimination

The State's interest in complying with the stipulations and orders of the Connecticut superior court are not compelling enough to justify its use of racial quotas. A stipulation by parties cannot abrogate the rights of non-parties, and the Plaintiffs here were not parties to the stipulation entered by the Superior Court. The Supreme Court's decision in *Martin v. Wilks*, 490 U.S. 755 (1989), is instructive. In *Wilks*, a group of white firefighters challenged Birmingham's adoption of consent decrees that settled a Title VII lawsuit brought by the NAACP and black firefighters. *Id.* at 758-59. In particular, the decree contained race-based remedies including annual goals for hiring black firefighters.

When the *Wilks* plaintiffs alleged that the remedies amounted to discriminatory treatment under Title VII, the City argued that the suit was an "impermissible collateral attack [ ]" on the consent decrees. *Id.* at 760. The Supreme Court rejected the City's argument and held that the consent decrees were not preclusive since the plaintiffs had not been parties to the original action. *Id.* at 762. The Court held that "a party seeking judgment binding on another cannot obligate that person to intervene; he must be joined." *Id.* at 763. In so doing, the Court upheld the longstanding

principle that plaintiffs "cannot be deprived of [their] legal rights in a proceeding to which [they are] not a party." *Id.* at 759.

Stipulations entered into by the state in a separate lawsuit cannot abrogate a non-party's constitutional rights. In the Second Circuit, "it is well settled that no voluntary settlement— whether entered as a consent decree, approved under Rule 23(e), or agreed to in private—can dispose of the claims of a non-consenting third party." *United States v. Brennan*, 650 F.3d 65, 118 (2d Cir. 2011) (citations omitted). Plaintiffs who challenge race-based requirements in a consent decree must be given "the opportunity that *Wilks* requires: the opportunity to prove that the race-conscious measures taken pursuant to the consent decree [are] invalid because the consent decree (1) [does] not serve a remedial purpose, or (2) [is] not tailored narrowly enough." *Donaghy v. City of Omaha*, 933 F.2d 1448, 1458 (8th Cir. 1991). Plaintiffs here were never given that opportunity; and stipulations entered into by the superior court cannot deprive them of their right to equal protection under the Fourteenth Amendment.

### D. The State Has Failed To Prove That Remedying *De Facto* Racial Discrimination[12] Is a Sufficiently Compelling Interest To Justify Intentional Racial Discrimination

The Supreme Court has never held that an interest in remedying *de facto* segregation is sufficiently compelling to justify intentional discrimination on the basis of race.[13] While the Second Circuit once implicitly found a state's interest in remedying *de facto* discrimination to be a "compelling" governmental interest, *Parent Ass'n of Andrew Jackson High Sch. v. Ambach*, 598 F.2d 705, 720 (2d Cir. 1979), it has also made plain that this interest won't be assumed and must

---

[12] The State also argues that the racial quota is designed to remedy *de facto* segregation on the basis of *economics*. *See* State Mem. at 13. Because no Court has ever found that remedying *intentional* segregation on the basis of economics is sufficiently compelling to justify intentional racial discrimination, there is certainly no authority suggesting intentional racial discrimination is justified by *de facto* economic segregation.

[13] The State concedes that the cap on Black and Hispanic enrollment in the Hartford region's interdistrict magnet schools is not required to remedy past, intentional discrimination. *See* Compl. ¶ 78; State Ans. ¶ 78.

be factually proven by the government entity seeking to invoke it in a future case. *See Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 752 (2d Cir. 2000) ("In this respect, the question of whether the precise goals of the Program fit within the *Andrew Jackson* analysis *requires a fact-specific determination* that we believe should be made by the District Court in the first instance.") (emphasis added).[14] At the pleading stage, this Court has no evidence before it to hold that the State's interest in remedying *de facto* discrimination is compelling.[15]

The State and Intervenors incorrectly rely on Justice Kennedy's concurrence in *Parents Involved* to support their non-remedial interest in discriminating against Hartford's Black and Hispanic children.[16] According to the State, Justice Kennedy's concurring opinion (joined by no other Justice) "is deemed the Court's holding," because it represents the narrowest grounds upon which a majority of the Court agreed.[17] State Mem. at 10. Either the State misunderstands the rule with respect to "fragmented" opinions from *Marks v. United States*, 430 U.S. 188 (1977), or it misunderstands the holding in *Parents Involved*. In any event, Justice Kennedy's *Parents Involved* opinion plainly has no precedential value.

*Marks* applies when "a fragmented [Supreme] Court decides a case and no single rationale explaining the result enjoys the assent of five Justices." *United States v. Leonard*, 844 F.3d 102,

---

[14] *Brewer* also openly questioned the continuing validity of *Andrew Jackson* in light of *Croson* and *Wygant*. *Brewer*, 212 F.3d at 746-47 ("[S]erious questions exist as to whether the goal of the Program as defined above—reducing racial isolation in order to ameliorate arguably *de facto* segregation—serves a sufficiently compelling government interest to justify use of a racial classification."). Of course, more recent decisions of the Supreme Court also call into question *Andrew Jackson*'s continued validity.

[15] The *Brewer* court emphasized that just because the government *may* have a compelling interest in remedying *de facto* segregation, does not mean that interest is necessarily present without a fully developed factual record. *See id.*, 212 F.3d at 752 ("At this point, therefore, we conclude … that a compelling interest *can* be found in a program that has as its object the reduction of racial isolation and what appears to be *de facto* segregation.").

[16] The State also relied on guidance issued by the United States Department of Justice in December 2011. *See* State Mem. at 16-17. As the State recognized in a recent filing with this Court, that guidance has been rescinded. Dkt. No. 61. In any event, the guidance was an aberration in terms of the United States' views on race-based measures. Its rescission marks a return to an understanding that race should not be used unless necessary to achieve a compelling governmental interest.

[17] Intervenors fare no better calling Justice Kennedy's opinion "controlling." Intervenors' Mem. at 18.

108 (2d Cir. 2016) (quoting *Marks*, 430 U.S. at 193). In these cases, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds." *Id.* And where an opinion fractures on an issue that was unnecessary to the judgment—as in *Parents Involved*—"there is then no law of the land because no one standard commands the support of a majority of the Supreme Court." *United States v. Alcan Aluminum Corp.*, 315 F.3d 179, 189 (2d Cir. 2003).

Since *Parents Involved* is not a fractured decision, *Marks* does not apply. The Court issued a majority opinion—joined by Justice Kennedy—that explains the rationale for the judgment. The Court could not have been clearer. *Parents Involved*, 551 U.S. at 708 ("Chief Justice ROBERTS announced *the judgment of the Court*, and delivered the opinion *of the Court* with respect to Parts I, II, III–A, and III–C") (emphasis added). The Court's opinion—upon which the judgment is based—holds that strict scrutiny applies to all racial classifications, and that the race-based student-assignment programs at issue were not narrowly tailored to a compelling state interest. *Id.* at 720-25, 733-35. There is no *Marks* issue.[18]

Intervenors' analysis regarding the State's compelling interest in remedying *de facto* discrimination fares no better. Tellingly, Intervenors' authorities do not involve equal protection claims at all. *See Figueroa v. Foster*, 864 F.3d 222, 232 (2d Cir. 2017) (preemption); *Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City Univ. of N.Y.*, 502 F.3d 136, 148 (2d Cir. 2007) (free association claim). That is because the Supreme Court has never accepted the counterintuitive

---

[18] While Justice Kennedy did not join the plurality opinion on the question of whether the state had a compelling interest for its race-based policy in elementary schools, *id.* at 725-33 (plurality op.), that does not render the judgment fractured. It means only that there is no opinion of the Court with respect to whether the government may ever invoke race to achieve non-remedial ends in K-12 education. *See Alcan Aluminum*, 315 F.3d at 189. Because the compelling-interest discussion was not necessary to the judgment, there is no *Marks* question.

proposition that *unintentional* discrimination on the part of *private* actors could somehow justify *intentional* discrimination on the part of the *government*.[19]

Nor is the interest in avoiding potential violations of federal disparate impact laws an apt comparison to Connecticut's interest here. Disparate impact laws avoid constitutional problems only insofar as they use "race-neutral tools." *Texas Dep't of Hous. & Cmty Affairs v. Inclusive Cmtys. Project, Inc.*, 135 S. Ct. 2507, 2525 (2015). As Intervenors must know, even a good-faith fear of disparate impact cannot justify the disparate treatment of students here. *See Ricci*, 557 U.S. at 581.

## III.   THE STATE HAS FAILED TO PROVE THAT ITS DISCRIMINATION AGAINST BLACK AND HISPANIC CHILDREN IS NARROWLY TAILORED TO A COMPELLING GOVERNMENTAL INTEREST

Because the State reserves a fixed percentage of opportunities for racial groups, Connecticut's 75% cap on Black and Hispanic students at Hartford magnet schools is plainly an unconstitutional racial quota. *See Croson*, 488 U.S. at 496. As the Supreme Court has repeatedly held, enrollment policies designed to achieve some specified percentage of a particular group merely because of its racial or ethnic origin are patently unconstitutional. *Grutter*, 539 U.S. at 330; *see also Freeman v. Pitts*, 503 U.S. 467, 494 (1992) ("Racial balance is not to be achieved for its own sake."); *Parents Involved*, 551 U.S. at 732 (2007) ("Racial balancing is not transformed from 'patently unconstitutional' to a compelling state interest simply by relabeling it 'racial diversity.'"); *Fisher*, 570 U.S. 297 (same).

---

[19] Intervenors make a similar error when they argue that the racial quota challenged here remedies the effects of past discrimination. Remedying the past effects of *de jure* segregation can be a compelling governmental interest; remedying the past effects of *de facto* segregation never is. *Milliken v. Bradley*, 433 U.S. 267, 281 n.14 (1977); *see also Freeman v. Pitts*, 503 U.S. 467, 495 (1992) ("Where resegregation is a product not of state action but of private choices, it does not have constitutional implications.").

Racial quotas violate the Constitution for many reasons, not the least of which is that quotas treat people not as individuals, but solely as members of a racial group. *See Miller v. Johnson*, 515 U.S. 900, 911 (1995) ("At the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class."). Individualized consideration is "paramount" in a race-conscious program like the one here. *Grutter*, 539 U.S. at 337. Yet the Connecticut quota system lacks a crucial component of a narrowly tailored scheme: "a system where individual assessment is safeguarded through the entire process." *Id.* at 392 (Kennedy, J., dissenting).

Rather than safeguard individual assessment, the quota here makes race the determinative factor in whether a student is allowed to enroll in a magnet school. The State's quota is so inflexible that Hartford's magnet schools leave desks unoccupied if enrolling an additional Black or Hispanic child would upset the racial quota. Compl. ¶ 1. As a result, Black and Hispanic students are relegated to failing neighborhood schools solely because of their race.

Indeed, the quota is appreciably *less* tailored than programs that the Supreme Court has held unconstitutional. In *Gratz v. Bollinger*, 539 U.S. 244 (2003), the Supreme Court struck down a University of Michigan admissions program that gave 20 points to every applicant of an underrepresented minority group. *Id.* at 256. This program was not narrowly tailored, the Court held, because instead of considering how "differing backgrounds, experiences, and characteristics" of the applicants might benefit the school, admissions counselors would award certain applicants 20 points based only on race. *Id.* at 273. Here, the State's program affords prospective students even less individualized review than the program invalidated in *Gratz*. In *Gratz*, the 20 points given to applicants based on race accounted for only a fifth of what they needed to gain admission to the University. *Id.* at 270. Connecticut's program, however, makes race the sole factor in

whether a prospective student can attend a magnet school. If a Hartford magnet school is already 75% Black and Hispanic, then the school can fill open seats only with white or Asian students; it may not allow Black or Hispanic students to attend or it will lose funding.

The State's reliance on the *Brewer* court's narrow tailoring analysis is misplaced. There, the Second Circuit held that the narrow tailoring analysis used in cases in which diversity is the governmental interest does not apply when the government seeks to further an interest in remedying *de facto* segregation. *See id.* at 752-53. As the government acknowledges, however, *Brewer* predates important equal protection cases such as *Parents Involved. See* State Mem. at 13. And in *Parents Involved*, the Court—Justice Kennedy included—was perfectly clear about using the long-established narrow tailoring framework from the Court's earlier equal protection jurisprudence *Id.* at 733-34 (citing *Grutter*, 539 U.S. at 320).

Although Justice Kennedy's *Parents Involved* opinion is not precedential, the State is wrong that it provides shelter for their unconstitutional quota. *See* State Mem. at 11. Justice Kennedy suggested that to reduce racial isolation, school districts may not use race-conscious, but only *race-neutral*, means. *See Parents Involved*, 551 U.S. at 789 (Kennedy, J., concurring). The programs that Justice Kennedy listed as examples—"strategic site selection of new schools; drawing attendance zones with general recognition of the demographics of neighborhood" and similar programs—"do not lead to different treatment based on a classification that tells each student he or she is to be defined by race." *Id.* In stark contrast, Connecticut uses racial classifications as the sole factor in determining whether a student may enroll in a Hartford magnet school with open seats.

The State's failure to consider workable race-neutral alternatives also dooms its quota system. The State fails to identify[20] a single race-neutral alternative that it has tried in its efforts to reduce racial isolation.[21] It fails to proffer any evidence that race-neutral decisions about resource allocation, personnel, and curriculum would prevent Connecticut from reducing racial isolation in Hartford—in other words that it must resort to pernicious racial quotas. As the entity implementing racial classifications, the State bears the burden to prove "that the reasons for any racial classification are clearly identified and unquestionably legitimate." *Fisher*, 570 U.S. at 297. It cannot do so at this time. The Court must conduct the narrow tailoring inquiry with the benefit of discovery or, if anything, Plaintiffs are entitled to judgment. *Brewer*, 212 F.3d at 752 (remanding to the district court in light of the "extremely fact-specific analysis required for the narrow tailoring inquiry").

The State and Intervenors urge this Court to conduct the narrow tailoring analysis using the factors articulated by the Supreme Court in *United States v. Paradise*, 480 U.S. 149, 171 (1987). *See* State Mem. 17; Intervenors Mem. at 27. But *Paradise* is inapplicable here because the government does not assert a compelling interest in "remedying *its own* past discrimination." *Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006) (examining race-conscious measures adopted to remedy the government's past discrimination) (emphasis added). *See* Compl. ¶ 78; State Ans. ¶ 78 (admitting that "Defendants' cap on black and Hispanic student enrollment is not

---

[20] Of course, the State should not be expected to offer those alternatives at the pleading stage, which underscores just how improper this motion is at this time.

[21] While the State's Answer contends that "race-neutral" protocols are used, State Ans. ¶¶ 56-60, it also concedes that these "race-neutral" protocols are used solely to reach race-defined outcomes—making them "race-neutral" in name only. *See, e.g., id.* ¶ 63. More tellingly, the State's recently-filed declaration—although outside the pleadings—admits that students are denied spots only because of their racial and ethnic identity. *Id.*, Ex. H at ¶ 32 ("[Magnet school] operators must consider the racial and ethnic demographics of applicants in determining whether to fill available seats and how many to fill. RSCO collaborates with operators on filling seats as it relates to school compliance and will restrict the number of seats filled, if any, if adding students from the waitlist will negatively affect the school's compliance with the [Reduced Isolation] standard.").

required to remedy past, intentional discrimination").[22] Rather, Connecticut seeks to remedy generalized societal discrimination. Connecticut's use of race is so blunt, however, that it would fail narrow tailoring under *Paradise*.

Under *Paradise*, the court looks to (a) "the necessity for the relief and the efficacy of alternative [race-neutral] remedies," (b) "the flexibility and duration of the relief, including the availability of waiver provisions," (c) "the relationship of the numerical goals to the relevant labor market," and (d) "the impact of the relief on the rights of third parties." *Paradise*, 480 U.S. at 171. First, as mentioned above (at Subsection B), Connecticut has failed to make even a cursory showing of any consideration of available race-neutral alternatives. To support this prong, Intervenors rely *entirely* on allegations from outside the pleadings related to the (supposed) causes for Hartford's racial demographics.[23] Intervenors' claim that the quota was "developed … over time" has nothing to do with the need for relief and fails to show that any race-neutral remedies were attempted. Intervenors' Mem. at 26.

Connecticut's racial quotas fail under the rest of the *Paradise* factors as well. Although the State claims that some flexibility is "warranted due to the rapidly changing demographics of the region," it does not dispute that Hartford's quota system sets a hard, inflexible 75% cap on Black and Hispanic enrollment. Intervenors, in contrast, note that a quota is a program in which "certain *fixed* number or *proportion* of opportunities are reserved exclusively for certain minority groups."

---

[22] Intervenors' reliance on *United States v. Sec'y of Hous. & Urban Dev.*, 239 F.3d 211 (2d Cir. 2001) is misplaced. *See* Intervenors' Mem. at 27 (quoting *Sec'y of Hous. & Urban Dev.* at 219 (citing *Paradise*, 480 U.S. at 171)). That case—along with *Swann*, *Little Rock* and others—dealt with remedial race-based measures designed to remedy past, intentional segregation. That is not the case here as the State explicitly admits. *See* State Ans. ¶ 78.

[23] In their Memorandum in Support, Intervenors rely on "studies" and "reports" purporting to show that the racial makeup of Hartford's schools was an intentional result of unrelated discriminatory laws. For example, Intervenors cite to a 1955 report by the Connecticut Commission on Civil Rights that discusses the (alleged) effects of housing laws. *See* Intervenors' Mem. at 4. This report—released almost a decade before the 1964 Civil Rights Bill was enacted—has nothing to do with Plaintiffs' allegations. And, as explained above, because none of this information is relevant, and because it is all from outside the pleadings, the Court may not consider it.

Intervenors Mem. at 27 (emphasis added) (quoting *Grutter*, 539 U.S. at 335). Intervenors nonetheless fail to admit that the 75% cap is a hard mandate, describing it instead as a "benchmark for assessing progress[,]" *id.*, and a "'starting point in the process of shaping a remedy[,]'" *id.* at 28. According to Connecticut law, however, the governing authority for "each" interdistrict magnet school "*shall* . . . maintain a total school enrollment that is in accordance with the reduced-isolation setting standards," Conn. Gen. Stat. § 10-264*l*(a) (emphasis added)—and according to those standards, "the percentage of [reduced-isolation (*i.e.*, white and Asian)] students enrolled in the interdistrict magnet school must equal at least 25 percent of the total school enrollment." Compl. ¶ 47, Ex. 1. Intervenors also suggest that the lottery itself is flexible. Intervenors Mem. at 28. While the lottery takes various factors into account, the end result is the same—the enrollment of no more than 75% Black and Hispanic students in each magnet school.

Further, Connecticut's program lacks policies that could save its arbitrary quota. For example, by refusing to provide waivers to African-American students seeking to enroll in schools with empty seats, the Hartford quota flunks the flexibility requirement. *See Paradise*, 480 U.S. at 177 (focusing its flexibility analysis solely on whether requirements could be waived).[24] Nor does the Hartford program incorporate sunset provisions or periodic reviews to ensure that its racial classifications "are limited in time" and "have a logical stopping point." *Grutter*, 539 U.S. at 342. Intervenors suggest that the *Sheff* remedies have "temporal limits" since the stipulations had expiration dates. Intervenors' Mem. at 29. But the requirements in the stipulations—in particular, the 75% cap on minority enrollment—have been codified with no end-date.

---

[24] Intervenors claim that schools are given waivers. Intervenors' Mem. at 27. But once again, Intervenors rely on information from outside the pleadings. Even if Intervenors' allegations are true, they do not counsel for an order granting the motions for judgment on the pleadings. If anything, these kinds of factual questions require a denial of these motions and a discovery schedule.

Finally,[25] the Hartford quota system unfairly burdens innocent third parties. The quota prevents Black and Hispanic students from enrolling in magnet schools with empty seats and forces the students to remain in failing neighborhood schools. Yet the Equal Protection Clause protects a student from being "foreclosed from all consideration . . . simply because he was not the right color." *Grutter*, 539 U.S. at 341. If denying one Black or Hispanic student the chance to fulfill his potential at a Hartford magnet school is the price of achieving racially balanced schools, then "the price is too high to meet the standard of the Constitution." *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 630 (1991).[26]

## IV.   PLAINTIFFS HAVE PLED SUFFICIENT FACTS WITH RESPECT TO THE HARTFORD BOARD

Plaintiffs pled sufficient facts to survive Defendant Stallings' Motion for Judgment on the Pleadings. Plaintiffs allege that the Hartford Board operates magnet schools within the Hartford Public Schools school district, that the Board admits students using a lottery process that prefers white and Asian students over Black and Hispanic students, and that the Board controls enrollment to ensure compliance with the 75% cap on Black and Hispanic enrollment.

Plaintiffs easily meet the Supreme Court's plausibility standard outlined in *Twombly* and *Iqbal*. Those decisions held that plaintiffs must plead facts sufficient to show that a claim has substantive plausibility. *See Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 347 (2014). But the core of that requirement is to ensure that a defendant is put on notice of the factual basis for a complaint. *Id.* Plaintiffs are not required to plead "specific evidence or extra facts beyond what is needed to make the claim plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120-21 (2d Cir.

---

[25] The third *Paradise* factor is inapplicable in this context, because the inquiry requires the government to determine the "number of minorities qualified to undertake the particular task." *Croson*, 488 U.S. at 502. This case involves students who were denied the opportunity for a quality education not workers who were denied a job.

[26] Intervenors argue that the magnet schools wouldn't even exist but for the *Sheff* decision. Intervenors Mem. at 29. But of course, their existence does not justify the use of racially discriminatory policies.

2010). The determination of whether claims are plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Defendant Stallings' Answer, not to mention the Hartford schools' involvement in *Sheff* over the past thirty years, belie any contention that Defendant Stallings is not on notice of the factual basis for Plaintiffs' claims.

Plaintiffs have properly alleged sufficient facts to establish substantive plausibility of the Hartford Board's use of race-based criteria in admissions in violation of the Equal Protection Clause. The city of Hartford intervened in the *Sheff* action and took part in negotiations that led to the Phase II and Phase III Stipulations that established the 75% cap on minority enrollment in Hartford's magnet schools. Compl. ¶¶ 38-42. The Hartford Board is tasked with overseeing admissions for every student in every Hartford public school, including magnet schools subject to the minority enrollment cap. *See id*. ¶ 26 (citing Conn. Gen. Stat. § 10-220(a)). The Board directly operates approximately 20 such schools within the school district. *Id*. ¶ 51; Stallings Ans. ¶ 51. Admissions to those magnet schools are made in partnership with the RSCO using the challenged lottery process. Compl. ¶¶ 50-51; Stallings Ans. ¶¶ 50-51. The only logical inference is that the Hartford Board partners with the RSCO to determine admissions to schools that it operates, subject to a race-based cap on minority enrollment. This involvement—alleged by the Plaintiffs and admitted by Stallings—pushes Plaintiffs' allegations well past "substantive plausibility." *See Johnson*, 135 S. Ct. at 347.

According to Stallings, however, Plaintiffs' sole allegations as to the Board are that it has "charge of the schools of its [] school district" and therefore must "determine the number, age and qualifications of the pupils to be admitted into each school" and "designate the schools which shall be attended by the various children within the school district." Compl. ¶ 26 (citing Conn. Gen.

Stat. § 10-220(a)); Stallings Ans. ¶¶ 26, 51. But the Complaint also repeatedly alleges that the Hartford Board has direct involvement in the lottery process used to admit students to magnet schools. For example, Plaintiffs allege that that the lottery is conducted by the RSCO "in partnership with school districts . . . ." Compl. ¶¶ 33, 50.

Plaintiffs also allege the city of Hartford's[27] intervention and direct involvement in the Phase II and Phase III Stipulations, which established the racial quota challenged in this lawsuit.[28] Further, the Phase III Stipulation—reached with the involvement of the City of Hartford—defines when and how students are considered "reduced-isolated." As admitted by both Stallings and the State, Asian students are counted as non-minorities to reach goals of "reduced-isolation settings," while still counting as minority students for the purposes of calculating the numbers of minority students in such settings. *See* Compl. ¶¶ 41-42; Stallings Ans. ¶¶ 41-42; *and* State Ans. ¶¶ 41-42. Because the Hartford Board bases admissions on these standards and controls admissions for all schools it operates, Plaintiffs have plausibly pled a cause of action against Defendant Stallings.

*Iqbal* does not help Stallings. The Court in *Iqbal* held that the pleadings gave only a bare recital that the challenged policy was adopted *because of* rather than *in spite of* race. 556 U.S. at 669, 677. But the quota challenged here is specifically designed and enforced in a manner to achieve a particular racial balance within Hartford Public Schools—as Plaintiffs have properly pled. *See* Compl. ¶ 39. There is no requirement to allege that Stallings engaged in an ostensibly

---

[27] It is unquestioned that the Hartford Board is tasked by statute with control of the admissions of *all* students in any Hartford school, which includes oversight of any interdistrict magnet schools involved in the lottery process, and the Board has admitted its role in the operation of approximately 20 magnet schools that use the lottery process to admit students. Stallings Ans. ¶ 51.

[28] Defendant Stallings claims that Plaintiffs have "fail[ed] even to allege that the Hartford Board was aware of the 75% minority cap or the RSCO lottery . . . ." Stallings Mem. at 6. But not only is such knowledge a logical inference from allegations that the city of Hartford directly engaged in the Phase II and III Stipulations that established the 75% cap, it is the only possible inference. The Board is tasked with designating which schools shall be attended by which students, and it is subject to the minority cap crafted by the Phase II and Phase III Stipulations between the City, state officials, and the Sheff Plaintiffs.

race-neutral policy "because of race," since the policy being challenged is *not* race-neutral—it is facially discriminatory. *See Arista Records,* 604 F.3d at 120-21 (noting that plaintiffs are not required to plead "specific evidence or extra facts beyond what is needed to make the claim plausible"). Plaintiffs have decidedly *not* pled impermissible racial animus, as in *Iqbal*, since that is not the nature of the constitutional violation here.

To the extent that Plaintiffs cannot specify many factual details of the interplay between the state and city actors with regards to the RSCO Lottery process, the blame lies with Defendants who have intentionally hidden details of that process from public view.[29] The Board cannot avoid liability by willfully hiding its unconstitutional activities from public scrutiny. Where, as here, multiple state and city actors are working in partnership, an opaque process divided among the parties would allow each to plausibly deny involvement. But the Plaintiffs have pled that *all* of the Defendants engage in a process that by using race-based criteria to achieve desired racial outcomes in school admissions, violates the Equal Protection Clause. Compl. ¶¶ 71-94. It is possible, though unlikely, that discovery will establish that the Hartford Board plays no role in the process that determines admissions to the magnet schools it operates, but that possibility does not undermine the plausibility of Plaintiffs' allegations. Plaintiffs are entitled to discovery to obtain the evidence needed to prove their allegations.

## V.     *PULLMAN* ABSTENTION IS INAPPROPRIATE

Intervenors urge this Court to invoke the *Pullman* abstention doctrine and avoid the important constitutional issues in this case. *See* Intervenors' Mem. at 13-16. There is no basis for

---

[29] *See, e.g.*, Jacqueline Rabe Thomas, *School Choice Lottery 'Flawed,' 'Unfair'*, Hartford Courant Digital Edition (2015) ("The state annually publishes a guide to help parents navigate the system. However, it does not provide school performance results or offer guidelines about school vacancies, acceptance rates or lottery procedures.") (http://digitaledition.courant.com/tribune/article_popover.aspx?guid=59a0ab0b-ce5d-4163-acf3-f9a5dd9e7ae3); *see also* Jacqueline Rabe Thomas & Jake Kara, *School Choice Lottery a Mystery for Parents as Desegregation Efforts Stall*, Connecticut Mirror (Feb. 27, 2018) (https://ctmirror.org/2018/02/27/school-choice-lottery-mystery-parents-desegregation-efforts-wane/).

doing so. "Abstention is the exception, exercise of the jurisdiction is the rule." *United Fence & Guard Rail Corp. v. Cuomo*, 878 F.2d 588, 593 (2d Cir. 1989). The Second Circuit has cautioned courts to "hesitate to invoke the *Pullman* doctrine[,]" *id.*, since doctrines of abstention are "extraordinary and narrow" exceptions to the unflagging duty of district courts to adjudicate controversies properly within federal jurisdiction. *See Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976). "The obligation to shoulder the jurisdictional burden is not one lightly to be renounced. A district court may abdicate its duty only in exceptional circumstances." *Greater New York Metro. Food Council v. McGuire*, 6 F.3d 75, 77 (2d Cir. 1993).

Intervenors bear the burden of proving that the "three basic conditions [which] must be present to trigger *Pullman* abstention" are present here. *United Fence*, 878 F.2d at 594. First, the state statute must be unclear or the issue of state law uncertain; second, resolution of the federal issue must depend upon the interpretation given to the ambiguous state provisions; and third, the state law must be susceptible to an interpretation that would avoid or modify the federal constitutional issue. *Id.* Further, even if all three factors existed here, this Court is still not required to abstain. *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 100 (2004). On the contrary, the Court should still hear the case where, as here, "important federal rights . . . outweigh the interests underlying the *Pullman* doctrine." *Id.* (quotations omitted).[30]

## A.  Intervenors Fail To Identify an Ambiguous Issue of Connecticut Law

*Pullman* abstention is improper here, because there is nothing unclear about the law Plaintiffs are challenging. Connecticut law requires, for school years commencing in 2017 and 2018, that "the governing authority for each interdistrict magnet school . . . maintain a total school enrollment that is in accordance with the reduced-isolation setting standards for interdistrict

---

[30] Intervenors misstate the law when they claim that "[u]nder *Pullman*, this Court *must* stay its hands" when certain conditions are met. Intervenors' Mem. at 13 (emphasis added).

magnet school programs, developed by the Commissioner of Education ....” Conn. Gen. Stat. § 10-264*l*(a). Those standards, issued in October 2017, set the current reduced-isolation standards for “Sheff magnet schools at 25 percent” and explicitly make race the only factor for determining “reduced-isolation” students. *See* Compl. Ex. 1. Intervenors do not allege any ambiguity in these laws. Intervenors Mem. at 13-16. Accordingly, because “the statute is clear on its face, and there is no indication that it has been interpreted in any unclear way,” abstention is inappropriate. *Williams v. Lambert*, 46 F.3d 1275, 1282 (2d Cir. 1995).

Instead of arguing that the challenged *laws* are ambiguous—as *Pullman* demands—Intervenors raise other (purported) ambiguities concerning the State’s obligations under the *Sheff* decision.[31] Intervenors argue that ambiguity exists because the (unambiguous) law at issue may be deemed unnecessary sometime in the future. *See* Intervenors’ Mem. at 13-14 (arguing that ambiguity exists because the “State Defendants have asked the *Sheff* court to clarify whether the reduced isolation standard . . . is an appropriate remedy in *Sheff*”). This argument fails for multiple reasons. First, Intervenors cite no authority to support their claim that otherwise clear statutory language is ambiguous just because it could be changed at a later date. *See Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450 (2002) (Courts “determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.”).

Second, Intervenors cannot base a claim of ambiguity on the mere chance that the state superior court may hold unnecessary a standard it has already approved multiple times. *See* Intervenors’ Mem. at 14 (noting that the “state superior court had approved past stipulations containing [the racial quota]”; *cf. Williams*, 46 F.3d at 1282 (abstention is inappropriate where an interpretation “has been used repeatedly in recent years”).

---

[31] Ironically, Intervenors do not argue that the *Sheff* mandate is ambiguous in state court. There, Intervenors fully defend the need for the racial quota under *Sheff*.

In short, the Intervenors' claim of "ambiguity" has nothing to do with the statute's meaning; rather the asserted ambiguity—if it exists as all—involves only whether the statute's racial quota could be deemed unnecessary through a ruling by future interpretation of *Sheff*'s requirements.[32]

### B. Resolution of the Plaintiffs' Federal Claims Does Not Turn on an Interpretation on the Ambiguity (if It Exists) of State Law

The state superior court is not being asked to interpret any law that would affect Plaintiffs' claims. As noted above, no party to the *Sheff* lawsuit disputes the clarity of Conn. Gen. Stat. § 10-264*l*(a), and Intervenors do not argue otherwise here. Although the State has asked the trial court to clarify the scope of the Connecticut Supreme Court's mandate in *Sheff*, no one is asking the superior court to invalidate the racial quota.[33] The State puts it well: there is significant "uncertainty as to when, how[,] *or if* the Superior Court in *Sheff* will answer" the questions posed by the State. State Mem. at 5 (emphasis added). That the superior court may not even answer the questions relating to the scope of the Connecticut Constitution demonstrates that Plaintiffs' claims here do not turn on anything the trial court can be expected to do.

All parties to that litigation—and this litigation—agree that the racial quota at issue is required under Connecticut law. The State Defendants (with the Intervenors) agreed to it, adopted a law incorporating that agreement, and promulgated a regulation interpreting the statute. Intervenors have vigorously defended the quota for years and continue to do so before this Court. And the superior court, for its part, has already approved multiple settlements containing the racial quota.

---

[32] That ambiguity, however, goes to the third *Pullman* factor—whether a decision by the trial court would avoid the federal constitutional issue. As explained below, because the Intervenors argue abstention may not even resolve the federal issue Plaintiffs raise here, the Court may not abstain.

[33] The State recently sought to replace the 75% quota with an 80% quota on minority enrollment that would be just as unconstitutional as the current one. *See* Intervenors' Mem. at 11-12. And Intervenors *opposed* it.

"Specifically, [therefore,] the defendants have failed to identify unclear state law issues whose *proper interpretation* would resolve, moot, or modify the federal constitutional issue presented." *Planned Parenthood of Dutchess-Ulster, Inc. v. Steinhaus*, 60 F.3d 122, 126 (2d Cir. 1995) (emphasis added). To the contrary, Intervenors argue that the unambiguous quota *is proper* under Connecticut law. It is quite disingenuous for Intervenors to argue that the law is ambiguous in this Court while at the same time defending its necessity in the state superior court.

Finally, Intervenors don't even proffer an interpretation of Connecticut law that would obviate Plaintiffs' claims in this Court. *Cf. id.* ("[D]efendants have not explained how the federal issue presented in this case … could be mooted by any particular interpretation of the state regulations at issue."). Instead Intervenors argue that the second *Pullman* factor is met because "whether the reduced isolation standard is an appropriate remedy under the Connecticut Constitution" will avoid Plaintiffs' claims here. Intervenors Mem. at 14. That is quite the crooked formulation of the second *Pullman* factor. In essence, Intervenors argue that because an unambiguous law may unexpectedly change—notwithstanding their belief that it shouldn't—the Court should abstain. That is nonsense.

### C. The Challenged Statute Is Not Susceptible to an Interpretation That Would Avoid Plaintiffs' Constitutional Claims

The third and final *Pullman* factor is likewise absent. Intervenors fail to even argue that the challenged statutes are susceptible to an interpretation that would avoid Plaintiffs' constitutional claims. They aren't. Instead Intervenors argue that "the determination of these state law questions is essential to the arguments that *all Defendants* intend to advance." Intervenors' Mem. at 15 (emphasis added). Intervenors cite no law,[34] and Plaintiffs are aware of none, that

---

[34] *Reetz v. Bozanovich*, 397 U.S. 82 (1970) does not help Intervenors. There, fisherman sought a declaration that certain Alaskan laws were unconstitutional. The Court abstained only because "provisions of the Alaska Constitution at issue ha[d] never been interpreted by an Alaska court." *Id.* at 86. The case did not concern the availability of

holds that the Court should abstain if a *defense* to an (un)ambiguous statute *could* become available after state-court litigation. Moreover, the only plausible defense that could be available—assuming defenses are relevant in this context—would arise only if the Connecticut trial court held that the quota was unconstitutional. But this Court cannot abstain to allow the state court to rule on the constitutionality under the United States Constitution. "[T]o permit state courts to rule first on . . . federal constitutional claims is inconsistent with Congress' grant of federal jurisdiction." *United Fence*, 878 F.2d at 596.

### D. Even if Intervenors Could Meet All Three *Pullman* Requirements, Abstention Remains Inappropriate Because Important Federal Rights Are at Stake

Even if Intervenors could show that the three basic *Pullman* factors have been met—and they cannot—this Court should still hear the case because "important federal rights . . . outweigh the interests underlying the *Pullman* doctrine." *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 385 (2d Cir. 2000); *see also Baggett v. Bullitt*, 377 U.S. 360, 375 (1964) (abstention "involves a discretionary exercise of a court's equity powers"). The constitutional rights of Hartford's Black and Hispanic families are at risk, and there is no guarantee that those rights would be respected if this Court were to abstain. *See Tunick v. Safir*, 209 F.3d 67, 78 (2d Cir. 2000) ("[D]eferral to the state court is appropriate only where the claimed right can be sufficiently safeguarded during the pendency of state proceedings."). The exclusion of Black and Hispanic children from magnet schools, just as the exclusion of Black citizens from jury service, is "an evil the 14th Amendment was designed to root out." *Brown v. Kelly*, 973 F.2d 116, 119 (2d Cir. 1992). Now is not the time for delay.[35] It is instead "necessary and proper to admit to public schools on a racially

---

potential defenses that the Defendants might raise. And, of course, the Connecticut Supreme Court ruled on the demands of the Connecticut Constitution over twenty years ago in *Sheff*.

[35] Litigation in the state courts is about to enter its third decade. Abstention is wholly improper "where the litigation has already been long delayed." *Harris Cty. Comm'rs Court v. Moore*, 420 U.S. 77, 84 (1975).

nondiscriminatory basis *with all deliberate speed*[.]" *Brown v. Bd. of Educ. of Topeka, Kan.*, 349 U.S. 294, 301 (1955) (emphasis added).

## V.    CERTIFICATION TO THE CONNECTICUT SUPREME COURT IS INAPPROPRIATE

Both the State Defendants and Defendant Stallings ask the Court to certify questions to the Connecticut Supreme Court, but like Intervenors in their request for abstention, Defendants fail to identify any state-law ambiguities that would affect Plaintiffs' federal constitutional claims. The law challenged here requires Hartford's interdistrict magnet schools to maintain a 25% quota of white and Asian students. No party here disputes the statute's meaning, content, or purpose, and no party asks this Court to interpret it in a manner outside of its plain meaning.

The issues before the Court involve questions of federal law: (1) whether the statute and the racial quotas it contains violate the Equal Protection Clause; and (2) whether the enrollment procedures used to ensure compliance with the racial quota violate the equal protection rights of Hartford's Black and Hispanic families. *See* Compl. ¶¶ 71-94. The Black and Hispanic Hartford families bringing this lawsuit are entitled to have a federal court decide those federal constitutional issues. That is especially true here where the state court system is at least cognizant of, if not complicit in, this perverse system of continual infringement of federally protected rights.

To determine whether to certify questions to the Connecticut Supreme Court, the Court first asks whether a state law needs clarification. A question cannot be certified unless the state law at issue is "ambiguous" or fairly "susceptible" to a limiting construction. "It would be manifestly inappropriate to certify a question in a case where, as here, there is no uncertain question of state law whose resolution might affect the pending federal claim." *City of Houston, Tex. v. Hill*, 482 U.S. 451, 471 (1987).

Indeed, because all parties agree that Conn. Gen. Stat. § 10-264*l*(a) is unambiguous, certification to the Connecticut Supreme Court would be improper here even if Plaintiffs' claims turned on state law. As the Second Circuit has held, a court should decline certification where "sufficient precedent exists" to allow a federal court to make a "reasonable prediction" about how the state court would interpret the law. *DiBella v. Hopkins*, 403 F.3d 102, 111 (2d Cir. 2005); *McCarthy v. OLIN Corp.*, 119 F.3d 148, 154 (2d Cir. 1997). Certification is appropriate only "where there is a split of authority on the issue, where the statute's plain language does not indicate the answer, or when presented with a complex question of [state] common law for which no [state court] authority can be found." *Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 51 (2d Cir. 1992); *see also Dorman v. Satti*, 862 F.2d 432, 435 (2d Cir. 1988) (certification is inappropriate unless a dispositive issue is "readily susceptible to a curative construction"). None of these scenarios apply here. There is no split of authority; there is no ambiguous statute at issue; there is no complex issue of state common law; and there is no curative construction that can save Conn. Gen. Stat. § 10-264*l*(a).

What is plain from the State's[36] proposed questions, State Mem. at 4-5, is that it does not seek clarification of any law *at issue in this case*. Rather, it wants to know whether, *in the future*, it may be permitted under state law to enact laws that are not as constitutionally dubious as the statute and enforcement procedures challenged here. Questions 1, 2, and 3 concern how the State should satisfy the *Sheff* mandate, questions that would not help the Court determine any issue involved in this case.[37] Questions 4 and 5 are not relevant to Plaintiffs' claims except to the extent

---

[36] Defendant Stallings copied the State's questions and added one: "What is the scope of educational programs that qualify as 'schools' under the education mandates of the Connecticut State Constitution for purposes of compliance with the *Sheff* mandate?" Stallings Mem. at 8. Like the State's first three questions, this relates to the scope of the Connecticut Constitution—it does not render anything Plaintiffs are challenging ambiguous, and its answer would not help the Court to resolve Plaintiffs' federal constitutional claims.

[37] At best, the Connecticut Supreme Court could authorize the State, in some future *Sheff* settlement, to stop requiring the unconstitutional discrimination Plaintiffs challenge here. But that is not a basis for certification. *See Sternberg v.*

the Connecticut Supreme Court could recognize that more Black and Hispanic families are likely to suffer without ruling from this Court.[38] Question 6 asks the Connecticut Supreme Court to weigh in on the federal issue before this Court: whether the United States Constitution "constrains" the remedies adopted by the State and challenged here. State Mem. at 5. Whether the U.S. Constitution constrains the State's "remedial steps"—and it obviously does—it is surely not the *state* court's duty to resolve. *See City of Houston*, 482 U.S. at 471 n.23.

Plaintiffs should not have to wait for an unnecessary ruling from the Connecticut Supreme Court before obtaining a ruling from this Court. Defendants agreed to the stipulations containing the unconstitutional racial quota, adopted a statute incorporating the quota, issued a regulation to administer it, and have enforced this unconstitutional policy for years. *See* Conn. Gen. Stat. § 10-264*l*(a); Compl. Ex. 1. This Court needs no clarification concerning the law or resulting practices at issue in this case. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 n.11 (1988) ("[W]e have never held that a federal litigant must await a state-court construction or development of an established practice before bringing suit.").

Nor should certification be used as a mechanism for improperly shifting burdens to state courts when certification is not otherwise compelled. *Kidney v. Kolmar Labs.*, 808 F.2d 955, 957 (2d Cir. 1987). The proposed questions would do just that—they invite the state court either to excuse the State Defendants' unconstitutional conduct or to relieve them from complying with the statutes the State itself adopted. But, "[a] federal court may not properly ask a state court if it would care in effect to rewrite a statute." *City of Houston*, 482 U.S. at 471.

---

*Carhart*, 530 U.S. 914, 945 (2000) (federal courts should not certify a question to the state courts to avoid a constitutional question properly before it).

[38] As the State recognizes, Hartford and its suburbs are becoming increasingly Black and Hispanic. State Mem. at 5. If the 25% white/Asian quota is not struck down, thousands more Black and Hispanic students will suffer in the coming years. This truth, however, does not render the state law ambiguous, nor does it give the Court any reason to certify a question to the Connecticut Supreme Court.

In addition to the legal reasons that render certification inappropriate, prudential reasons weigh against certification. *See Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974) (Certification "rests in the sound discretion of the federal court."). In a case where the education of Hartford's Black and Hispanic children is at stake, any delay would be "a sure way of defeating the ends of justice." *Clay v. Sun Ins. Office Ltd.*, 363 U.S. 207, 228 (1960) (Douglas, J., dissenting). Certification is particularly inappropriate "where time is of the essence" and the certification period itself could lead to further violation of rights under the questioned law. *Gutierrez v. Smith*, 702 F.3d 103, 117 (2d Cir. 2012).

Further, all parties in this lawsuit representing parents and families of Hartford-area children—including Intervenors—oppose certification.[39] Intervenors' Mem. at 15-16. The "[o]pposition to the certification of a question of state law" is a factor that should be given "substantial" consideration when determining whether to certify to the Connecticut Supreme Court. *Goodlett v. Kalishek*, 223 F.3d 32, 38 n.4 (2d Cir. 2000).

The authorities cited by the Defendants do not support certification. Their lead case, *Munn v. Hotchkiss* was a tort lawsuit in federal court under diversity jurisdiction. 795 F.3d 324, 334 (2d Cir. 2015). The remaining authority cited by the State is similarly deficient. *See Elec. Contractors, Inc. v. Ins. Co. of Pa.*, No. 11CV1432 VLB, 2012 WL 6021321, at *4 (D. Conn. Dec. 3, 2012) (contractual dispute in federal court under diversity jurisdiction where an issue of state law would be dispositive); *The Cadle Co. v. Fletcher*, 804 F.3d 198, 202 (2d Cir. 2015) (garnishment case in federal court under diversity jurisdiction where an issue of state law would be dispositive); *Griffin*

---

[39] Intervenors correctly explain that the existence of ongoing state litigation on the issues that the Defendants seek certified further militates against certification to the Connecticut Supreme Court. Intervenors Mem. at 15-16 (citing *Bethphage Lutheran Serv., Inc. v. Weicker*, 965 F.2d 1239, 1247 (2d Cir. 1992)). Indeed, the State has already posed the *very same questions* to the state trial court. State Mem. at 4. Intervenors are wrong, however, that the questions currently pending before the state superior court counsels in favor of abstention. *See supra* at Arg. IV.

*v. Sirva Inc.*, 835 F.3d 283, 294 (2d Cir. 2016) (statutory claim under New York law in federal court under diversity jurisdiction). Defendant Stallings' authority fairs no better. *See Cweklinsky v. Mobil Chem. Co.*, 297 F.3d 154, 160 (2d Cir. 2002) (cause of action arising under Connecticut law); *Parrot v. Guardian Life. Ins. Co. of Am.*, 338 F.3d 140, 144-45 (2d Cir. 2003) (same); *Sealed v. Sealed*, 332 F.3d 51, 59 (2d Cir. 2003) (whether certain duties are required under Connecticut law).

In sum, there is no issue of Connecticut law that this Court should certify to the Connecticut Supreme Court. This suit raises only federal claims. There is no ambiguous state law that this Court must interpret to rule on those federal claims. No authority cited by Defendants supports certifying questions to a state court in a federal-question lawsuit that raises constitutional challenges to an unambiguous state law which the Defendants enforce in the precise manner alleged by the Plaintiffs. Not only are Hartford's Black and Hispanic families entitled to bring their equal protection claims in federal court, they can obtain relief only from this Court. To determine the constitutionality of Defendants' actions, the Court need only determine whether the discrimination perpetrated by Defendants is narrowly tailored to a compelling state interest. That is not a question that needs certification.

## CONCLUSION

This Court should deny the Defendants' motions and allow this case to proceed to discovery.

DATED: July 13, 2018.

Respectfully submitted,

_____/s/ Wencong Fa_____
JOSHUA P. THOMPSON, Cal. Bar No. 250955*
WENCONG FA, Cal. Bar No. 301679*
OLIVER J. DUNFORD, Cal. Bar No. 320143*

JEREMY TALCOTT, Cal. Bar. No. 311490*
Pacific Legal Foundation
930 G Street
Sacramento, CA 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
E-Mail: JThompson@pacificlegal.org
E-Mail: WFa@pacificlegal.org
E-Mail: ODunford@pacificlegal.org
E-Mail: JTalcott@pacificlegal.org

SCOTT SAWYER, Conn. Bar. No. 411919
Sawyer Law Firm
The Jill S. Sawyer Building
251 Williams Street
New London, CT 06320
Telephone: (860) 442-8131
Facsimile: (860) 442-4131
E-Mail: scott@sawyerlawyer.com

*Counsel for Plaintiffs*

*\* Pro Hac Vice*

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2018, a copy of foregoing PLAINTIFFS' COMBINED RESPONSE TO STATE DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT; DEFENDANT STALLINGS' MOTION FOR JUDGMENT ON THE PLEADINGS; AND INTERVENORS-DEFENDANTS' MOTION FOR THE COURT TO ABSTAIN OR, IN THE ALTERNATIVE, FOR JUDGMENT ON THE PLEADINGS was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

_____/s/ Wencong Fa_____
JOSHUA P. THOMPSON, Cal. Bar No. 250955*
WENCONG FA, Cal. Bar No. 301679*
OLIVER J. DUNFORD, Cal. Bar No. 320143*
JEREMY TALCOTT, Cal. Bar. No. 311490*
Pacific Legal Foundation
930 G Street
Sacramento, CA 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747
E-Mail: JThompson@pacificlegal.org
E-Mail: WFa@pacificlegal.org
E-Mail: ODunford@pacificlegal.org
E-Mail: JTalcott@pacificlegal.org

*Counsel for Plaintiffs*

*\* Pro Hac Vice*